519 A.2d 795

**Frederick R. WEISMAN, et al.**

v.

**Arthur B. CONNORS.**

**No. 522, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Jan. 13, 1987.

**734**

Paul F. Strain (Benjamin R. Civiletti, Christopher R. Mellott, Oscar S. Gray and Venable, Baetjer and Howard, on the brief), Baltimore, for appellants.

George Beall (Kristine A. Crosswhite, E. Christina Gerstung and Miles & Stockbridge, on the brief), Baltimore, for appellee.

Argued before WILNER, WEANT and BISHOP, JJ.

WILNER, Judge.

In 1981, Arthur Connors was an executive with the Ford Motor Company who had reached the end of his career ladder. He had been passed over for promotion; he had received no salary increase for two years and no bonus for 1980; his staff had been significantly curtailed. Things were bleak, and he was searching around for something better. Fortuitously for Mr. Connors, Frederick R. Weisman, owner of Frederick Weisman Company (FWC), was looking for an automobile executive to oversee FWC's various subsidiary companies, including its major subsidiary, Mid-Atlantic Toyota (MAT). After extensive arm's length negotiations, FWC rescued Mr. Connors from his uncertain future at Ford and gave him a three-year contract at a salary substantially in excess of what he was then making. But alas, Mr. Connors did not measure up, and, when Mr. Weisman complained and tried to take corrective measures, Mr. Connors quit, with nine months still to go on his contract.

That is how Mr. Weisman and FWC see this case.

Arthur Connors was a high-level executive at Ford, hand-picked in 1976 by Henry Ford II and Lee Iacocca to be vice-president for sales, worldwide. He was chairman of the company's marketing committee, a member of its product planning and quality committees, and was in line to become vice-president for all of Ford's European operations. His compensation was substantial. He earned a base salary of $140,000 a year. He also had regularly received annual

bonuses averaging about 62% of his salary. In 1977 and 1978, his bonus was $135,000; in 1979, it was $80,000. It was due only to a severe but temporary slump in the industry that he, along with other Ford executives, received no bonus for 1980. In addition to the monetary compensation, he was able to participate in a stock option plan under which he had options on 12,000 shares of Ford stock, a special savings plan where Ford would match a percentage of deferred compensation, and a pension plan that would allow him to retire at 60% of his salary. He had the use of two company cars—one a Lincoln—and the company paid his country club dues and the premiums on a $200,000 life insurance policy. Although he was not happy about the temporary retrenchment measures undertaken by Ford, he was not actively seeking other employment.

Along came an uninvited industrial "headhunter," who lured him to a meeting with Mr. Weisman. Weisman, a first-class charmer, promised him full managerial control over FWC and its subsidiaries, an equity position in all new ventures undertaken by Weisman relating to the automobile industry, and full compensation for all the perquisites he would forfeit by leaving Ford. Believing Mr. Weisman to be a man of his word, Connors reluctantly severed his 32–year association with Ford and went to work for FWC. Weisman soon changed everything, however; he demoted Connors, failed to provide the bonuses and perquisites promised, and actually hired someone else for the position specified in Connors' contract. Regarding this as a constructive discharge, Connors left.

That is how Arthur Connors sees this case. It is also how a jury in the Circuit Court for Anne Arundel County saw the case. At the end of a long trial at which both versions of the relevant events were forcefully presented, it found that Weisman and FWC had not only breached their contract with Mr. Connors but had induced him to enter into it by negligent misrepresentations. To compensate Mr. Connors for his resulting loss, it awarded damages of $2,705,-

961—$221,900 for the constructive discharge/breach of contract and $2,484,061 for the negligent misrepresentation.

It goes without saying that Mr. Weisman and FWC are not well pleased with those verdicts, and so they have appealed from the judgments entered on them. Six issues are presented, four dealing with the legal theories underlying Connors' case, one challenging the method by which the jury calculated damages, and one involving certain expert testimony that apparently provided the basis of the damages award. Finding no reversible error, we shall affirm.[1]

## I. *Theories of Recovery*

### A. *Averments and Evidence*

The case proceeded on Connors' Second Amended Complaint, which contained four counts—breach of a written employment agreement with FWC, breach of a separate oral agreement with Weisman, negligent misrepresentation, and fraud. The court, on motion, dismissed the action based on the alleged oral agreement, and so the jury considered only the other three counts. It found for the defendants on the fraud count, but, as noted, returned a plaintiff's verdict on the remaining breach of contract and the negligent misrepresentation counts.

The underlying basis for all of the causes of action was set forth in a number of introductory paragraphs in the complaint. We shall skip over how, when, and where the parties met, which is not especially germane, and start with the alleged inducements. Connors pled and in his testimony at trial confirmed the following:[2]

---

1. Mr. Connors has noted a cross-appeal with respect to the fraud count but made clear at oral argument that the cross-appeal is a protective one and that he does not wish a reversal of the judgment or remand for retrial if he is successful as an appellee.

2. In setting forth what occurred, Mr. Connors was much more succinct in his pleading than he was in his testimony. For purposes of brevity, we shall quote from the Second Amended Complaint. The essence of those statements was confirmed, however, in his testimony.

(1) Weisman was the owner of FWC, which was essentially a holding company. It had, at the time, a number of subsidiaries, the major one being Mid-Atlantic Toyota (MAT), a major Toyota distributor responsible for five States and the District of Columbia. The general manager of MAT was one Robert McCurry.

(2) Connors made clear that he was not interested in running MAT—that his job with Ford was on a much higher level than that. Weisman responded that he was satisfied with McCurry, although he had a "communication problem" with him, that what he was looking for was someone "to supervise all automotive related operations of FWC and the expansion of FWC into new business ventures." He stated further that Connors would not be the general manager of the distributorship but would instead be the

> "Chief Operating Officer of FWC, would report directly to Weisman, would supervise the general managers of the automotive businesses owned by FWC, including MAT, that he would direct the development of new business ventures for FWC and for Weisman, individually, *and that he would share in the ownership of those ventures.*"

(Emphasis added.)

(3) The issue of equity participation was important to Connors. He was not interested in leaving Ford simply for a higher salary, as he would be giving up a lot of perquisites that had value to him; and he conveyed that to Weisman. Weisman "gave Connors the assurances he sought." He represented that "[t]he value of the ownership interests Connors would receive in those ventures ... would surpass the reduction in Connors' pension benefits from Ford and would compensate him for the intangible losses which would flow from Connors' leaving Ford."

(4) As part of the inducement, Weisman reminded Connors, then 56 years old, that, if he remained at Ford, he would have to retire at age 65, but that "with FWC, he

could work beyond the age of 65 and the value of his equity interests would grow over the years."

(5) Based on these representations, Connors agreed to leave Ford and join FWC. He had a lawyer prepare a letter agreement which, together with one addendum, both parties signed.

The written agreement was in the form of a letter from FWC to Connors. It was dated May 5, 1981, and "outlines the essential terms of our agreement...." FWC agreed to employ Connors "as Executive Vice President of the corporation" for a term of three years commencing June 1, 1981. As Executive Vice President, "it is expected that you will have broad responsibility for the entire operations of the Company's Automotive Division, including Mid-Atlantic Toyota," three other subsidiaries, "and related operations." The "basic salary" would be $200,000 per year.

Paragraph 3 of the agreement described a bonus arrangement. It provided for a flat $50,000 bonus at the end of FWC's current fiscal year, and:

"At the end of each subsequent fiscal year of the Company during the term of your employment, you will be entitled to receive a bonus to be determined in accordance with a formula to be agreed to between you and the Company prior to the beginning of each such fiscal year. It is anticipated that your bonus target will be $100,-000.00 per year. You will also be eligible for consideration of additional merit bonuses, as may be awarded from time to time by the Company in its sole discretion."

The other provisions pertinent to this case are as follows:

"4. You will have a vested participation in those future ventures of the Company where you will have operating responsibility. The vested participation for each new venture will be negotiated separately.

5. Two (2) years after the Commencement Date, you and the Company will consider extending the term of your employment for an additional two (2) years upon such terms and conditions as may be mutually agreed

upon; if such extension is agreed upon, the term of this agreement shall be five (5) years from the Commencement Date.

\* \* \* \* \* \*

7.  On or before the Commencement Date, the Company shall purchase, for its own account, 2,300 shares of the common stock of Ford Motor Company. The Company shall forthwith transfer full ownership of such stock to you upon the execution of an extension agreement under paragraph 5 above.

8.  On the Commencement Date, and on each anniversary thereof during the term of your employment, the Company shall pay the insurance premium in connection with a $200,000.00 limited payment, full life insurance policy designed to be paid up in ten (10) equal annual installments. Such life insurance policy shall be owned by you and your assigns and the beneficiary thereof shall be your wife or such other person or persons as you may from time to time designate."

Pursuant to this agreement, Connors began work for FWC on June 1, 1981. He soon found, however, that:

(1) Weisman had more than a "communication problem" with Mr. McCurry and indeed had decided, even while negotiating with Mr. Connors, to get rid of McCurry. In November, 1981, Weisman insisted that Connors fire McCurry, whereupon Connors had to assume the role of managing MAT.

(2) FWC never purchased the $200,000 life insurance policy and never purchased the 2,300 shares of Ford stock.

(3) Connors received his $50,000 bonus for FY 1981, but, instead of receiving his "target" bonus of $100,000 for FY 1982, he received only $50,000.

(4) Throughout 1982 and into 1983, Weisman "interfered with Connors' attempts to perform his duties," becoming "directly involved in routine management functions at MAT."

(5) Finally, in June, 1983, Weisman/FWC hired one Jack Brown as "Executive Vice President Automotive Division of Frederick Weisman Company," limited Connors' duties to operating MAT, and required Connors to report to Weisman through Brown. Connors was taken off FWC's payroll and placed on MAT's payroll.[3]

Regarding this as a demotion, a violation of his contract, a breach of the representations made to him, and a constructive discharge, Connors, after consulting counsel, resigned. Although Weisman had started certain new ventures related to the automobile industry, Connors had not been offered any equity position in them.

Count I, for breach of contract, was based on the constructive discharge and on FWC's failure to give Connors vested participation in new ventures, to pay the appropriate bonuses, to purchase the life insurance policy, and to negotiate in good faith an extension of the contract for an additional two years. In Count III, based on negligent misrepresentation, Connors complained in particular of two representations made by Weisman which, he said, Weisman knew or should have known were false, which were negligently made, and which induced him to leave Ford and accept the position with FWC:

(1) That Connors would not be required to perform the duties of general manager of MAT; and

(2) That Connors would receive equity interests in new ventures of FWC, through which he would be compensated for the losses he would sustain by leaving Ford.

In Count IV, charging fraud, Connors averred that Weisman either knew that those representations were false or acted with reckless disregard for their truth or falsity. Further, he claimed that Weisman and FWC knowingly and intentionally failed to disclose to Connors that Weisman had

---

**3.** This averment as to payroll was not in the Complaint but was testified to by Mr. Connors.

already decided to discharge Mr. McCurry as general manager of MAT.

As we observed earlier, Weisman and FWC had a much different story to tell. The "facts" were very much in dispute.

### B. *Instructions*

In instructing the jury on the breach of contract action, the court carefully restricted the jury's focus to two matters—whether FWC constructively discharged Mr. Connors and whether it failed to purchase life insurance as provided for in the contract. It made clear that the jury could not consider FWC's failure to give equity participation, to give bonuses, or to extend the contract beyond the third year as a breach, although, if the jury found a breach otherwise, it could consider the failure to give equity participation or bonuses as an element of damages. In describing the concept of constructive discharge, the court essentially repeated what we said in *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 649–53, 477 A.2d 1197, *cert. denied* 301 Md. 639, 484 A.2d 274 (1984).

The court defined the tort of negligent misrepresentation by reciting, almost verbatim, the five elements set forth in *Martens Chevrolet v. Seney*, 292 Md. 328, 337, 439 A.2d 534 (1982). It told the jury that "[o]pinions or judgments" are not ordinarily sufficient to constitute a negligent misrepresentation, even if they turn out to be wrong. Similarly, it said:

"[A] statement concerning the speaker's intention to do or not to do something in the future may be a misrepresentation only if the speaker in fact was lying.... If a person truly states his intention to do or not do something and later changes his mind and acts differently, such statement about his intention is not a misrepresentation in the context of these instructions."

### C. *Appellants' Complaints*

As noted, four of appellants' six complaints deal with the legal bases of Connors' breach of contract and negligent

misrepresentation actions. As to the breach of contract action, they argue that (1) the court erred in defining a constructive discharge, (2) the evidence did not suffice to establish a constructive discharge, and (3) to the extent that they did not live up to the obligations initially specified by the contract, the contract was modified by the conduct of the parties. With regard to the action for negligent misrepresentation, appellants contend that (1) Connors failed to prove certain elements of the tort, and (2) the jury should have been instructed to ignore three of the five statements allegedly made by Weisman because they do not, as a matter of law, qualify as misrepresentations, and the court's failure to give that instruction vitiates the verdict. We shall deal with those complaints in that order.

### D. *Breach of Contract*

The problem with appellants' first complaint is that it rests upon a fundamental misconception of the law. They seem to suggest either that a constructive discharge cannot arise except in an at-will employment or that, to have a constructive discharge, there must be some "truly outrageous conduct" on the part of the employer approximating that needed to constitute an "abusive discharge" under *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981). No authority is cited for either proposition, and for good reason: the law is quite to the contrary.

As pointed out in *Brock v. Mutual Reports, Inc.,* 397 A.2d 149, 152 (D.C.Ct.App.1979), "The law is well established: when an employee contracts to fill a particular position any material change in duties or significant reduction in rank will constitute a constructive discharge which, *if unjustified,* is a breach of contract." (Emphasis in original.) *See also Hayes v. Resource Control, Inc.,* 170 Conn. 102, 365 A.2d 399, 400 (1976); *Steranko v. Inforex, Inc.,* 5 Mass.App.Ct. 253, 362 N.E.2d 222 (1977); Annot., *Reduction In Rank Or Authority Or Change Of Duties As Breach Of Employment Contract,* 63 A.L.R.3d 539, 545 (1975). This view is entirely consistent with the concept of constructive discharge enunciated by us in *Beye v. Bureau*

*of National Affairs, supra,* 59 Md.App. 642, 477 A.2d 1197, and in *Moniodis v. Cook,* 64 Md.App. 1, 11, 494 A.2d 212, *cert. denied,* 304 Md. 631, 500 A.2d 649 (1985): has the employer "deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign"?   See, in particular, *Cumb. & Penn. R.R. Co. v. Slack,* 45 Md. 161 (1876), where the Court recognized a constructive discharge involving a contractual employee.

■   It is beyond question that the evidence adduced by Mr. Connors sufficed to require submission of the issue to the jury.

■   Appellants' argument as to contract modification stems from the proposition that, "assuming that the original contract could have been breached if Connors had been forced to serve as general manager of MAT, the contract was modified when Connors agreed voluntarily to serve and then served as general manager from November of 1981 to September of 1983...."   There are two answers to that argument.   First, at best it would be a jury question of whether Connors' assumption of those duties amounted to a modification of the contract, especially in light of his testimony on the matter.   *See Steranko v. Inforex, Inc., supra,* 362 N.E.2d 222.   Second, even if Connors could be regarded as having acquiesced in assuming the role of general manager of MAT, he certainly did not acquiesce in the other changes made by Weisman, in particular the sharp curtailment in his responsibilities and authority *vis a vis* FWC.

### E. *Negligent Misrepresentation*

Appellants make a number of attacks on the negligent misrepresentation action, most of which rest upon a mischaracterization of the nature of the inducements made by Mr. Weisman.   One is based on a theory of law that was flatly rejected by the Court of Appeals.

The principal elements of the tort of negligent misrepresentation were succinctly summarized in *Martens Chevrolet v. Seney, supra,* 292 Md. 328, 337, 439 A.2d 534, as follows:

"(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

That is the framework for our analysis.[4]

Appellants contend "that commercial parties who bargain at arm's length owe each other no duty of care," and so, "in the absence of fraud or warranty," where a "special relationship" exists between the parties, "solid Maryland precedent accords with the general rule, rejecting the imposition of liability for negligent misrepresentation between the parties in most commercial situations."

That argument was also made in *Martens Chevrolet,* and this is what the Court said of it (n. 7 at 338, 439 A.2d 534):

"Appellees have also argued that even if negligent misrepresentation is a viable tort in this State, it can never be applied to statements made in connection with consummation of an arm's length transaction, as was involved in the present case. We find nothing in *Virginia Dare [Stores v. Schuman,* 175 Md. 287, 1 A.2d 897 (1938)] or its

---

**4.** At oral argument, appellants laid great stress on the recent decision of the Court of Appeals in *Jacques v. First Nat'l Bank,* 307 Md. 527, 515 A.2d 756 (1986). While *Jacques* contains an excellent exposition of the nature and elements of tortious negligence, we fail to see how it affects this case. There is nothing in *Jacques* that purports to modify the principles set forth in *Martens Chevrolet.*

progeny to support such a sweeping assertion and we reject it."

■ The commercial or arm's length nature of the transaction and negotiations is no doubt relevant to whether the plaintiff was justified in relying on the defendant's statements, but it does not suffice to withdraw the transaction from the scope of the tort.

Appellants' other contentions proceed from the notion that the inducements at issue were merely statements of Weisman's current "intentions" and were not, therefore, the kind of statements to which the tort applies. While it may be possible for a person actually to lie about his intentions, which would constitute fraud, it is not possible to negligently misrepresent intentions. There is no such tort, they proclaim, as "promissory negligence," and, at worst, that is all that occurred here.

In addressing this argument, it is important to recall that, when the case was submitted to the jury, the fraud count was still alive. Appellants do not complain of that in this appeal. Even under appellants' theory, therefore, allowing the jury to consider the fact and context of the various statements allegedly made by Mr. Weisman, including any that may have represented only current intention, was not *per se* wrongful. As we observed, in instructing the jury as to negligent misrepresentation, the court made clear that a statement of intention to do or not to do something in the future could not be regarded as a misrepresentation unless the speaker was actually lying—that it was not actionable merely because the speaker "later changes his mind and acts differently...." In terms of this tort, therefore, the jury's focus was appropriately narrowed.

There were a number of things that Mr. Weisman said and promised that never came to pass. Four of them, at least, were critical to inducing Mr. Connors to leave Ford and accept employment with FWC: (1) that Connors would have broad executive responsibilities with regard to FWC in all aspects relating to the automobile business; (2) that he

would not be simply the general manager of MAT; (3) that FWC would replace the $200,000 life insurance policy paid for by Ford; and (4) that Connors would receive equity participation in all new FWC ventures relating to the automobile business, and that the value of those ownership interests would more than offset the pension and other benefits that Connors would forfeit by leaving Ford.

■ Whatever may be the nature of other statements made by Weisman, those four went beyond mere current intention or expectation. They were statements of fact—what the job would *be* and what it would *pay*. For the most part, they found their way into the actual contract and meet in every respect the standards set forth in *Martens Chevrolet.*[5]

## II. *Damages*

The jury's award on the negligent misrepresentation count was $2,705,961, which, coincidentally or otherwise, was precisely the amount requested by counsel in closing argument. Appellants infer that the jury must therefore have accepted in full the theories advanced by counsel and calculated Connors' loss as follows:

| | |
|---|---:|
| (1) Salary and bonus Connors would have earned had he remained at Ford until mandatory retirement in 1990 | $2,995,733 |
| (2) Contributions that would have been made by Ford in accordance with its executive savings plan | 67,340 |
| (3) Value of 3,450 shares of Ford stock on which Connors would have had options | 156,975 |

---

**5.** Attempting to latch onto *Creamer v. Helferstay,* 294 Md. 107, 448 A.2d 332 (1982), appellants argue that some of these statements should have been kept from the jury because "they contradicted the written contract that Connors and his lawyers negotiated after the statements were made." We fail to see the contradiction. The contract stated that Connors would have "broad responsibility for the entire operations of [FWC's] Automotive Division...." It promised "a vested participation in those future ventures of the Company where you will have operating responsibility," and specifically called for FWC to pay for a $200,000 life insurance policy.

| | |
|---|---|
| (4) Difference in Ford pension benefits arising from Connors' leaving at age 56 rather than age 65 (adjusted) | $ 10,913 |
| (5) Value of company cars Connors would have had at Ford | 25,000 |
| TOTAL LOSS: | $3,255,961 |
| LESS: actual earnings from FWC | −550,000 |
| NET LOSS: | $2,705,961 |

Appellants make three complaints regarding this assumed calculation of damages: first, it rests upon an inappropriate theory of damages; second, the testimony upon which the $2,995,733 figure for lost salary and bonus was based should not have been allowed; and, third, the court erred in failing to instruct the jury properly on Mr. Connors' duty to mitigate his loss. We shall consider those complaints in order.

### A. *Theory of Damages*

Over objection, the court instructed the jury that it could consider as damages on the negligent misrepresentation count "the value of the salary, bonuses, deferred compensation and benefits and other percs [*sic* ] Mr. Connors would have earned if he remained at Ford for such time as you find he would have reasonably remained at Ford" less "that amount that he actually received since leaving Ford...." Appellants view that instruction as stating a theory of damages not authorized by Maryland law.

In *Hinkle v. Rockville Motor Co.,* 262 Md. 502, 278 A.2d 42 (1971), the Court reviewed the two basic theories of damages that had been applied in fraud and deceit cases—the "benefit of his bargain" standard that seeks to "compensate the plaintiff as though the transaction had been carried out as represented," and the "out of pocket" standard that seeks to "return the plaintiff economically to the position he was in prior to the fraudulent transaction thus allowing him recoupment of actual losses but not expected gain." *Id.,* 504–05, 278 A.2d 42. Reviewing earlier cases

which, like *Hinkle*, involved situations where the plaintiff was induced to purchase some item of property by means of fraudulent misrepresentations, the Court observed that both standards had been applied at various times. It therefore concluded that, in fraud cases, Maryland was not wedded monogamously to either theory but instead had adopted the "flexibility theory." In defining this third theory, the Court seemingly adopted, as "a guide for the proper measure of damages in these cases," the following rules laid down in an earlier Oregon case:

"(1) If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule;

(2) if the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone;

(3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and

(4) where * * * the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed."

*Id.*, 511–12, 278 A.2d 42. *See also Aeropesca Ltd. v. Butler Aviation*, 44 Md.App. 610, 411 A.2d 1055, *cert. denied* 287 Md. 749 (1980).

The "flexibility theory," as expressed in *Hinkle* in the context of a fraud action, has also been applied to an action based on negligence, *Downs v. Reighard*, 265 Md. 344, 289 A.2d 299 (1972), and specifically to an action for negligent misrepresentation, *Ward Development Co. v. Ingrao*, 63 Md.App. 645, 493 A.2d 421 (1985).

It is clear from these cases that, although the "benefit of the bargain" test is available in a negligent

misrepresentation case, the preferred test seems to be the "out of pocket" one, designed, as stated in *Hinkle,* to return the plaintiff economically to the position he was in prior to the tortious transaction. That, we think, is essentially what the instructions given here told the jury it could do. This is not a case where the plaintiff was merely induced to buy some property that had a lesser value than was represented, where he can be made whole simply by returning the purchase price or the difference in value. To return Mr. Connors to where he was before the transaction requires compensation for all the earnings and other benefits he would have received had he remained at Ford, adjusted to present value and deducting what he actually received from FWC. We see the court's instructions, then, not as expressing a different theory foreign to Maryland law, but as expressing the theory preferred by our law.

### B. *Dr. Paul's Testimony*

Harvey Paul is an economist by profession. He was called as an expert witness to estimate the income that would have been earned by Mr. Connors had he remained with Ford until mandatory retirement (at age 65) in April, 1990. There were three components to that estimate: salary, bonus, and savings plan.

Dr. Paul started with the salaries and bonuses actually received by Mr. Connors in the ten years prior to his leaving Ford (1971–81). He found that, on the average, Connors' salary had increased during that period at the rate of 12% per year and that, on the average, his bonus equaled 62% of salary. Those were averages; in some years, the bonus was substantially in excess of salary, in others Connors received no bonus at all. From that historical data, the witness estimated that, had Connors remained at Ford until April, 1990, his salary would have continued to increase at an average rate of 10% a year (less than the 12% ten-year historical rate) and his annual bonuses would have averaged 60% of salary (again slightly less than the historical rate). To convert these figures to current 1985 dollars, Dr. Paul

added to the 1981–84 figures interest at the historical U.S. Treasury bill rate for those respective years and deducted from the 1986–90 figures interest at the average Treasury bill rate for 1981–84. The discount averaged 10½. The end result of those calculations was a loss of salary and bonus of $2,995,733.

As noted earlier in this Opinion, Ford had a savings plan for its executives. Under that plan, the employee could put aside up to 10% of salary and Ford would match 60% of that contribution. Paul noted that the plan had been suspended from 1981 to 1983 and, when recommenced in 1984, limited the match to 5% rather than 10%. Using assumptions similar to those he used in calculating lost salary and bonus, Dr. Paul estimated that Connors' loss would have been $67,340.

Appellants do not challenge Dr. Paul's basic expertise, which was sufficiently established. They attack instead his methodology: it is simply not proper, they contend, to assume a future progression of income based on historical percentages without taking account of actual experience in the automobile industry, at Ford, and with Ford executives, and Dr. Paul conceded that he was unaware of such experiences and had not taken them into account.

We stated the appropriate standard with respect to expert testimony in *Waltermeyer v. State*, 60 Md.App. 69, 79, 480 A.2d 831, *cert. denied* 302 Md. 8, 485 A.2d 249 (1984). Quoting in part from *Shivers v. Carnaggio*, 223 Md. 585, 588, 165 A.2d 898 (1960), and other cases, we

"start with the basic proposition that the admissibility of expert or opinion testimony is largely within the discretion of the trial court, subject to review on appeal, and that 'the test of admissibility of an expert's opinion should be whether his testimony will be of real appreciable help to the trier of fact in deciding the issue presented.'"

In that regard, in order to qualify as an expert, a witness "should have such special knowledge of the subject on

which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate." *Casualty Insurance Co. v. Messenger,* 181 Md. 295, 298, 29 A.2d 653 (1943); *Madden v. Merc.-Safe Dep. & Tr. Co.,* 27 Md.App. 17, 43, 339 A.2d 340 (1975).

In applying these standards—in determining whether the witness has the "special knowledge" sufficient to make him an "expert"—we have to focus on the nature and purpose of his testimony. Dr. Paul was not asked to opine upon the future prospects of the automobile industry or of the Ford Motor Company, or even of vice-presidents of the Ford Motor Company. He was asked to estimate the probable earnings of Arthur Connors over a nine-year period based on his actual position in 1981 and his record of actual earnings for the preceding ten years. Nothing more, nothing less. To do that, he made but one theoretical assumption—that the future course of Connors' earnings would tend to follow the past, historical course. Everything else was essentially a matter of arithmetic.

There is nothing new or remarkable about that kind of testimony. *See Lumber Terminals v. Nowakowski,* 36 Md.App. 82, 373 A.2d 282 (1977); *Good v. A.B. Chance Co.,* 39 Colo.App. 70, 565 P.2d 217 (1977). Appellants were free, of course, to argue as they do before us that the past was not mere prologue, that it is unreasonable to assume that Mr. Connors' salary would continue to grow at a compound rate of 10%; but it is not so inherently unreliable a method as to be inadmissible, and it is clear that, in his calculus, Dr. Paul was in command of the relevant facts. If the jury was inclined to accept that method of estimating what Connors would have earned at Ford, Dr. Paul's calculations would have been "of real appreciable help" to it in arriving at the dollar loss.[6] We therefore find no abuse of discretion in allowing the testimony.

6. In this regard, the jury was instructed as follows:

### B. *Mitigation*

Appellants complain that the court failed to instruct the jury properly as to Connors' obligation to mitigate his damages. Again, their complaint is in two parts, neither of which has merit.

After describing to the jury the various legal theories posited by Mr. Connors, the court gave its instructions on damages. As part of those instructions, it mentioned and defined the requirement of mitigation, making clear that its instructions on mitigation applied "throughout this case, whether it be contract, whether it be negligent misrepresentation or fraud, everyone, if you're injured by another party regardless of the theory, you're bound to mitigate damages." It continued:

"In the context of this case this means that the plaintiff was obligated to use reasonable diligence and this is in Mr. Connors' case in seeking other employment in the same or similar business. If you find Mr. Connors has established any of his claims and is entitled to compensatory damage, you should reduce the amount of such damages by those amounts that you believe Mr. Connors *could have earned after leaving the employment of the Company had he exercised reasonable diligence in seeking other employment in the same or similar business.* If you should find Mr. Connors made a reasonable effort to earn an income after he was discharged from the

---

"You again should give the expert testimony the weight and value you believe it should have. You're not required to accept any expert's opinion. You should consider an expert's opinion together with all the other evidence in the case. In deciding the weight and value of an expert's opinion, you may consider the other evidence, as I've said, as well as the inherent capability ex—inherent credibility of the expert's opinion. In weighing the opinion of the expert for inherent credibility you should consider his knowledge of the subject matter about which he's expressing opinion. The factual basis for his opinion including the investigation that he did or did not do, the instructions and directions given to him and the assumptions made thereon and the reasons expressed by the expert himself for reaching the opinion. An expert's opinion is without probative force if it does not have a rational basis."

[Weisman] Company, then he has mitigated his damages. In considering whether Mr. Connors has mitigated his damages, you may consider his age, his station of life and the types of work for which he is qualified, and what he did in fact mitigate, you reduce from those damages." (Emphasis added.)

Further into the court's charge, a question arose as to the instructions regarding Connors' pension rights and other "percs" from Ford. After a bench conference on that issue, the court continued its charge, in the course of which it said that any damages awarded for lost salary, bonuses, deferred compensation and other benefits Connors would have received from Ford "must be reduced by that amount *that he actually received* since leaving Ford ... in the way of compensation." (Emphasis added.)

■ Seizing upon that brief statement, appellants argue that the court failed to instruct the jury to "reduce any damages awarded for negligent misrepresentation by additional amounts that Connors could have earned ... through reasonable efforts...." As stated in *Schwier v. Gray*, 277 Md. 631, 637, 357 A.2d 100 (1976), however, "[i]t is well settled in Maryland that when considering the adequacy of jury instructions we will consider the charge as a whole and will not select out words, phrases or sentences which might, of themselves and out of context, appear to be misleading or inartful." The jury was given a correct and complete instruction on mitigation and was told that that instruction applied to all three legal theories being submitted to it for consideration.

■ Finally, appellants argue that the jury should have been instructed to reduce any award under the negligent misrepresentation count by $800,000—$100,000 a year for each year from 1983 to 1990. This is based on a statement Mr. Connors made during cross-examination that he would not be interested in a job paying less than $100,000 a year, which, appellants claim, "proves a failure to use reasonable efforts to mitigate his damages."

Once again, appellants are seizing on one statement, somewhat out of context. Mr. Connors stated that the automobile industry "is a very close community," that he had spoken with a number of his former colleagues and informed them of his availability, that he "would have gladly entertained anything that came my way through my contacts ... [b]ut, nothing has come my way." He had done some consulting work but had turned down one opportunity because it would have entailed a considerable investment of money on his part.

The court gave a proper instruction, one in accordance with the law announced in *Atholwood Development Co. v. Houston*, 179 Md. 441, 19 A.2d 706 (1941), and *Volos, Ltd. v. Sotera*, 264 Md. 155, 286 A.2d 101 (1972). Whether Mr. Connors used reasonable diligence in obtaining other employment was a question of fact for the jury. In light of the totality of evidence on that issue, appellants were not entitled, as a matter of law, to the deduction they requested.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.