NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-912                                    Appeals Court


        FTI, LLC, & another[1] vs.  ROBERT J. DUFFY & others.[2]


                        No. 22-P-912.

        Suffolk.    November 1, 2023. - July 31, 2024.

          Present:  Green, C.J., Blake, & Henry, JJ.



Consumer Protection Act, Businessman's claim, Unfair or
     deceptive act.  Contract, Employment, Agreement not to
     compete, Choice of law clause, Performance and breach.
     Employment, Constructive discharge.  Unlawful Interference.
     Practice, Civil, Consumer protection case, Directed
     verdict, Instructions to jury.




     Civil action commenced in the Superior Court Department on
October 17, 2016.

     The case was tried before Kenneth W. Salinger, J.


     Derek L. Shaffer, of the District of Columbia (Aliki Sofis
also present) for the defendants.
     John Siegal, of New York (Daniel M. Kavouras, of Ohio, &
Melissa M. Carvalho, of New York, also present) for the
plaintiffs.

---

     [1] FTI Consulting, Inc.

     [2] Stephen L. Coulombe, Elliot A. Fuhr, and Berkeley Research
Group, LLC.

Stacie A. Kosinski & Alexander W. Read, for Public Justice Center, Inc., amicus curiae, submitted a brief.

HENRY, J.  This matter arose when defendants Robert J. Duffy, Stephen L. Coulombe, and Elliot A. Fuhr resigned their positions with plaintiffs FTI, LLC, and FTI Consulting, Inc. (collectively, FTI), to work for defendant Berkeley Research Group, LLC (BRG), taking with them numerous FTI employees and clients.[3]  FTI brought suit alleging that the individual defendants were in violation of the noncompetition, nonsolicitation, and confidentiality provisions of their employment agreements and that, acting in concert with BRG, all the defendants wrongfully used FTI's confidential information to poach FTI's employees and clients.  Following a trial, a jury found the individual defendants liable for breach of contract[4] and BRG liable for tortious interference with contractual relations.  In addition, the trial judge found BRG liable for

---

[3] We refer to Duffy, Coulombe, and Fuhr, collectively, as the individual defendants and to Duffy, Coulombe, Fuhr, and BRG, collectively, as the defendants.

[4] The jury found that all three individual defendants violated the noncompetition and nonsolicitation provisions of their employment agreements and that Duffy and Fuhr, but not Coulombe, violated the confidentiality provisions.

aiding and abetting breaches of fiduciary duties and for violation of G. L. c. 93A.[5]

On appeal, the defendants argue that (1) BRG cannot be liable for violation of G. L. c. 93A because the conduct giving rise to that claim did not occur primarily and substantially in Massachusetts[6] and (2) the trial judge erred in allowing a directed verdict against them on part of their defense of constructive discharge and in instructing the jury on the remainder of that defense. We agree. Accordingly, we reverse so much of the judgment as holds BRG liable for violation of G. L. c. 93A. In all other respects, the judgment is vacated,

---

[5] The jury awarded FTI $21,077,000 in compensatory damages against all the defendants. The trial judge awarded $12 million in compensatory damages against BRG on FTI's aiding and abetting and c. 93A claims and $18 million in punitive damages against BRG on FTI's c. 93A claim. The trial judge then stated that his $12 million award (1) compensated FTI for injuries already compensated by the jury award and (2) was "subsumed" within the jury award. The defendants suggest that no judgment entered against them on the aiding and abetting claim, as no additional damages were awarded on that claim. That is incorrect where the trial judge's finding of liability against BRG on FTI's aiding and abetting claim is an alternative ground for so much of the judgment as holds BRG liable for $12 million. Cf. Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 629 (2010) (judgment could be affirmed on independent claims that involved identical damages).

[6] BRG raised this defense at trial, arguing to the judge in closing that the evidence showed that the underlying conduct did not occur primarily and substantially in Massachusetts.

and the matter is remanded for further proceedings consistent with this opinion.[7]

1.  Violation of G. L. c. 93A.  a.  Background.  We begin by summarizing the background pertinent to FTI's claim against BRG for violation of G. L. c. 93A and then, after analysis of the c. 93A issue, summarize the background pertinent to whether the individual defendants were constructively discharged.  Where BRG challenges the sufficiency of the evidence (specifically whether the conduct at issue occurred primarily and substantially in Massachusetts), and where the c. 93A claim was tried to the judge, ordinarily we would recite the trial judge's findings absent clear error.  See Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 470 (2003).  Here, however, the parties agreed to waive findings of fact and conclusions of law,[8] so we summarize the evidence in the light most favorable to the prevailing party, FTI.  See K & K Dev., Inc. v. Andrews, 103 Mass. App. Ct. 338, 344 (2023) (where parties waived detailed findings of fact, we apply standard of review applicable to

---

[7] We acknowledge the amicus brief submitted by Public Justice Center, Inc.

[8] To the extent we refer to any factual findings of the trial judge, they were made in an order on posttrial motions. BRG does not challenge any factual findings as clearly erroneous.

judgments entered after jury verdicts); Motsis v. Ming's Supermkt., Inc., 96 Mass. App. Ct. 371, 379-380 (2019).

FTI and BRG are competing consulting firms. FTI is a Maryland company headquartered in Washington, D.C., and BRG is a Delaware company headquartered in California, but they both perform work for clients across the country. Such work included, for example, financial analyses of other companies and assistance with mergers and acquisitions. As noted, the individual defendants all worked for FTI. Duffy and Coulombe resided in Massachusetts and were based out of FTI's Boston office. Fuhr resided in New York and was based out of FTI's New York City office, but he supervised employees in Massachusetts. Despite where they were based, the individual defendants performed work for clients across the country and traveled so frequently that they "liv[ed] out of suitcases."

In or around December 2015, a BRG recruiter reached out to Duffy. Duffy informed Coulombe and Fuhr of his conversations with the recruiter, and the three met with BRG in Washington, D.C., in January 2016. During negotiations, the individual defendants had additional in-person meetings with BRG in New York City. During Duffy's negotiations with BRG, Duffy told BRG that acquiring him was like "buy[ing] a business" and that most of his clients would follow him. On or around April 7, 2016, the individual defendants signed employment agreements with BRG.

Duffy's agreement, which he signed in New York City, included a provision for a "practice growth bonus" that he would earn by bringing employees to BRG.  Duffy's, Coulombe's, and Fuhr's agreements with BRG provided that they would not use any confidential information or trade secrets of any other party other than BRG or breach a prior employment restriction.  The next day, on April 8, 2016, the individual defendants simultaneously resigned from FTI in a joint telephone call.

In hiring Duffy, BRG sought to acquire other employees and clients of FTI.  The trial judge found that "Duffy actively participated in these efforts, and used FTI's confidential information to do so, while he was working for FTI out of its Boston office."  The evidence supports a finding that Coulombe created, and Duffy maintained, a spreadsheet that memorialized the defendants' efforts.  The spreadsheet was saved under the file name "Super Bowl"[9] and listed confidential information about employees' past, current, and projected compensation; the employees' revenue generation; offers BRG made to the employees; and descriptions of whether the employees were "definite," "probable," or "likely" recruits.  The judge found that, "[w]ith the help of the [individual defendants], [BRG] succeeded in

---

[9] As FTI's counsel argued in closing, the spreadsheet was saved under the file name "Super Bowl" because it was "the whole ball game on the issue of solicitation."

convincing [thirty-six] billing professionals -- including the three individual defendants -- to leave FTI and go to [BRG]."[10] One-half of the billing professionals who followed the individual defendants to BRG came from FTI's Boston office. Many clients, and their revenues, also left FTI. The trial judge found that, "[s]ince Duffy was the biggest rainmaker in [the] group, well over [one-]half of the client revenues that followed Duffy and his colleagues to [BRG] came from clients serviced by professionals who had been part of FTI's Boston office."

b. Discussion. The defendants' appeal requires us to determine whether "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." G. L. c. 93A, § 11. If the actions and transactions did not occur primarily and substantially within Massachusetts, BRG cannot be liable for violation of G. L. c. 93A. On this issue, because "the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth,"

---

[10] The recruiter who led BRG's efforts was located "[p]redominately" in Washington, D.C., although he also held meetings in New York City and Chicago. There was evidence that another recruiter made at least one visit to Boston.

the burden of proof was on BRG. Id. Accord Resolute Mgt. Inc. v. Transatlantic Reinsurance Co., 87 Mass. App. Ct. 296, 300 (2015). The analysis required under § 11 does not turn on any specific factors and instead involves determining "whether the center of gravity of the circumstances that g[a]ve rise to the claim" occurred here. Kuwaiti Danish Computer Co., 438 Mass. at 473. Whether BRG met its burden is "a question of law subject to plenary review." Id. at 470. We conclude that BRG met its burden.

The trial judge focused on Duffy's connections to FTI's Boston office, mainly that (1) Duffy was based out of the Boston office when he was using FTI's confidential data to help BRG[11] and (2) because of Duffy's connections to the Boston office, a significant concentration of the billing professionals and clients who followed the individual defendants to BRG were by happenstance also associated with the Boston office.[12] While the

---

[11] As noted, while Duffy was based out of FTI's Boston office, he performed his job on the road and spent little time in Massachusetts. Additionally, BRG recruited Duffy in part because he had business connections in southern California, where BRG hoped to expand its business.

[12] Of the thirty-three billing professionals who left FTI, sixteen came from the Boston office but seventeen came from outside Massachusetts, including a significant concentration from New York City. Approximately one hundred professionals remained in the Boston office. Further, those sixteen professionals who were based in Massachusetts, like Duffy, performed their work all over the country. To the extent FTI's

trial judge's analysis accurately captures Duffy's connections to the Boston office, the question is where "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred." G. L. c. 93A, § 11. The proper focus in this claim against BRG, therefore, is on where the wrongful conduct occurred. See Kuwaiti Danish Computer Co., 438 Mass. at 474 (removing from consideration conduct that was not wrongful).

As FTI concedes, "[r]ecruiting is not in itself unfair or deceptive." Rather, BRG's wrongful conduct involved (1) encouraging the individual defendants to collect FTI's confidential information and give it to BRG, including through the "Super Bowl" spreadsheet, and (2) using that confidential information in recruiting FTI's employees and clients.[13] BRG,

---

claimed damages included retention bonuses it paid to employees, the retention payments made by FTI occurred primarily outside Massachusetts.

[13] On FTI's claim for breach of contract, the jury found that Duffy and Fuhr, but not Coulombe, violated the confidentiality provisions of their employment agreements. See note 4, supra. Where the parties waived findings of fact and conclusions of law on the G. L. c. 93A claim, we do not know whether the trial judge agreed with the jury that Coulombe did not violate his confidentiality provision or whether the trial judge found differently, that Coulombe violated his confidentiality provision. See Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 186 (2013) (judge deciding c. 93A claim may make findings contrary to what jury found when deciding parallel common law claims).

and those acting at the behest of BRG, executed most of this scheme during meetings that took place outside Massachusetts. The individual defendants first met with BRG in Washington, D.C. Additional in-person meetings occurred in New York City. Duffy's contract with BRG, which the jury could have found included a bonus that incentivized him to bring over FTI's employees, was signed in New York City. The recruiter who led BRG's efforts, including the recruitment of other FTI employees, was located predominately in Washington, D.C. While Duffy aided BRG's efforts by collecting FTI's confidential information and giving it to BRG, he "liv[ed] out of suitcases" and could have collected FTI's confidential information anywhere in his travels.

Moreover, the resulting harm was sustained nationwide by an out-of-State business. FTI employees were negotiating with FTI and BRG. FTI's own witnesses testified that employees left FTI in "waves," starting in Boston and New York City but then extending across the country to Virginia, Charlotte, Atlanta, Dallas, Houston, the Midwest and the west coast. The clients who left also came from across the country. See Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 638-639 (1985) (where statements were made in Massachusetts but received and acted on in New York and any loss was incurred in New York, "significant contacts . . . [were] approximately in balance,"

they showed "no primary involvement with Massachusetts").[14] Indeed, FTI lost only one Massachusetts client to BRG's recruitment efforts in 2016.

In sum, "the center of gravity of the circumstances that g[a]ve rise to the claim" was not here. Kuwaiti Danish Computer Co., 438 Mass. at 473. Rather, this is a case where most of the wrongful conduct was "received and acted on" outside Massachusetts by an out-of-State business, Bushkin Assocs., Inc., 393 Mass. at 638, and where the injury was felt by another out-of-State business from employee and client defections across the country. Contrast Auto Shine Car Wash Sys., Inc. v. Nice 'N Clean Car Wash, Inc., 58 Mass. App. Ct. 685, 689 (2003) (G. L. c. 93A, § 11, claim occurred primarily and substantially in Commonwealth where deception and resulting harm both occurred in Massachusetts). In these circumstances, the fact that Duffy happened to be based out of the Boston office and that, consequently, a significant concentration of the billing professionals and clients who left were associated with FTI's Boston office, does not "suffice to bring this dispute within

---

[14] To the extent BRG's G. L. c. 93A liability was based on colluding with Fuhr, who was based out of the New York City office, in poaching New York employees and clients, FTI has not articulated any connection to Massachusetts.

the ambit of [G. L. c. 93A, § 11]." Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 623 (2014).

2. Constructive discharge. a. Background. We now summarize the background pertinent to whether the individual defendants were constructively discharged, which the defendants assert as a defense to the contract-based claims. Where the defendants' arguments require us to decide whether the trial judge erred in allowing a directed verdict against the defendants on part of this defense, see, e.g., Kolodziej v. Smith, 412 Mass. 215, 217 (1992), and whether, absent an erroneous jury instruction, the jury might have found that the individual defendants were constructively discharged, see, e.g., Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 118-119 (2000),[15] we summarize the trial evidence in the light most favorable to the defendants.

Prior to their departures, the individual defendants worked for FTI pursuant to written employment agreements that were expressly governed by Maryland law and contained noncompetition,

---

[15] In Abramian, because the erroneous instruction "stripped the jury of its fact-finding role," the question was whether jury could have found in favor of the nonprevailing party. 432 Mass. at 118-119. As we discuss infra, the erroneous instruction here presents a similar issue.

nonsolicitation, and confidentiality provisions.[16] Duffy's agreement, which was executed in 2006, stated that he would earn a minimum guaranteed salary of $1.5 million.[17] Duffy's agreement also stated that he was a senior managing director. However, Duffy was made the co-head of FTI's corporate finance and restructuring (CFR) group in 2011 and the global head of that group in 2014; he also served on FTI's executive committee. As with Duffy's agreement, Coulombe's and Fuhr's agreements guaranteed them certain minimum salaries and stated that they were senior managing directors. Both held leadership positions under Duffy.[18] Coulombe testified that his work was "intertwined" with Duffy's, and Fuhr testified that he relied on Duffy "for developing new business."

---

[16] The noncompetition and nonsolicitation provisions were limited to the "Restricted Period." The "Restricted Period" began "on the date of the execution of [the employment agreement] and end[ed] on the expiration of the period ending twelve (12) months from the termination date of Employee's employment." "Notwithstanding the foregoing, . . . the duration of the Restricted Period [was to] be extended by the amount of any and all periods that Employee violate[d] the [noncompetition and nonsolicitation provisions]."

[17] Duffy's salary was subsequently increased to $1.6 million, but the minimum guaranteed salary stated in Duffy's employment agreement remained $1.5 million.

[18] Coulombe was the leader of the retail practice in the CFR group. Fuhr was the head of the office of the chief financial officer.

In 2014, FTI appointed a new chief executive officer, Steven Gunby, who "set about making changes." Gunby proposed to reduce Duffy's minimum guaranteed salary by fifty percent, from $1.5 million to $750,000, but maintained that Duffy would make up the difference through increases to his bonuses. Duffy took a different view of Gunby's proposal; he did not want his minimum guaranteed salary reduced, let alone by fifty percent, and he thought the bonus plan was "too much under [Gunby's] control and discretion." In or around January 2016, which roughly coincided with when Duffy began negotiating with BRG, he informed Gunby that he would not be signing the proposed employment agreement. Gunby told Duffy not to attend the next executive committee meeting, made Duffy "acting" head of the CFR group, and told Duffy that FTI leadership would be informed that Duffy was transitioning out of his leadership roles in the CFR group and on the executive committee.[19] Despite taking steps to transition Duffy out of his leadership roles, Gunby testified that he wanted Duffy to stay at FTI and that Duffy was "a huge money-maker."

Duffy's involuntary transition out of his leadership roles occurred against the backdrop of other senior leaders being

---

[19] Duffy and Gunby testified to slightly different timelines of these events, but there is no dispute that Gunby was transitioning Duffy out of his leadership roles.

terminated. Coulombe and Fuhr testified that senior leaders were being "booted" or "pushed" out, and they thought Duffy was next. These were people that Coulombe and Fuhr respected and relied on to do their jobs. Coulombe was "quickly concluding that there was probably no future at FTI for [him]." Fuhr questioned how he was going to build business given what was going on within FTI.

Then, in or around February 2016, Coulombe and Fuhr were also presented with new employment agreements. FTI presented testimony that the new employment agreements were rolled out on a voluntary basis to reward high-performing employees. Similar to Duffy, Coulombe and Fuhr took a different view of the new employment agreements. Coulombe and Fuhr testified that they were offered the new employment agreements on a nonnegotiable basis and that the agreements eliminated their minimum guaranteed salaries and contained other punitive terms. Coulombe and Fuhr did not sign the new employment agreements. Coulombe felt that he had no future at FTI without Duffy, and Fuhr "felt just beaten." Gunby testified that, as with Duffy, he wanted Coulombe and Fuhr to stay at FTI.

b. <u>Discussion</u>. The defendants asserted constructive discharge as a defense to FTI's claims for breach of contract, tortious interference with contractual relations, and aiding and

abetting breaches of fiduciary duties.[20]  Given the choice of law provision in the individual defendants' employment agreements, this issue is governed by Maryland law.  We therefore turn to Maryland law on constructive discharge.

Maryland recognizes two theories of constructive discharge relevant to this case.  First, Maryland recognizes that an employee is constructively discharged when the "employee contracts to fill a particular position" and suffers a "material change in duties or significant reduction in rank[,] . . . if unjustified" (citation omitted).  Weisman v. Connors, 69 Md. App. 732, 743 (1987), rev'd on other grounds, 312 Md. 428

---

[20] These claims were tried on the basis that the individual defendants violated the noncompetition, nonsolicitation, and confidentiality provisions of their employment agreements and that BRG tortiously interfered with those provisions and aided and abetted the individual defendants in violating them.  As the trial judge ruled in a pretrial order, which FTI does not challenge on appeal, if the individual defendants were constructively discharged, their contractual obligations ended at that time.  See B-Line Med., LLC v. Interactive Digital Solutions, Inc., 209 Md. App. 22, 60 (2012) (material breach relieves other party of performance); Weisman v. Connors, 69 Md. App. 732, 743 (1987), rev'd on other grounds, 312 Md. 428 (1988) (constructive discharge is breach of contract).  This leaves open the possibility that some of the conduct giving rise to the defendants' liability may have occurred before the individual defendants were constructively discharged, which may be explored on remand.  Separately, regarding FTI's claim that the individual defendants violated the noncompetition and nonsolicitation provisions of their employment agreements, the trial judge instructed the jury, and there is no argument to the contrary, that the noncompetition and nonsolicitation provisions could not be enforced if the individual defendants were constructively discharged.

(1988).  Second, Maryland recognizes that an employee is constructively discharged "when an employer deliberately causes or allows the employee's working conditions to become so intolerable that the employee is forced into an involuntary resignation" (quotation and citation omitted).  Beye v. Bureau of Nat'l Affairs, 59 Md. App. 642, 651 (1984).

In determining whether someone's working conditions have resulted in a constructive discharge, Maryland applies a standard that has both objective and subjective elements.  See Beye, 59 Md. App. at 651-653.  The objective portion of the standard requires a court to determine whether "a reasonable person in the employee's shoes would have felt compelled to resign" (citation omitted).  Id. at 652.  The subjective portion of the standard is not as straightforward and has been the source of some disagreement.  As the court noted in Beye,

> "some courts have suggested that a constructive discharge does not occur unless the employer's actions are both deliberate and taken with the intention of forcing a resignation.  In most of the decisions, however, . . . such express intent has not been regarded as necessary.  It suffices if the employer's actions were deliberate or, in cases of harassment by supervisors or fellow employees, if the employer was aware of the situation and permitted it to continue."  (Citations omitted.)

Id. at 651-652. While the Beye court noted that "some courts" require proof of intent to force a resignation,[21] the Beye court did not adopt that requirement and instead concluded that the question is "whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign." Id. at 653.[22]

i. Directed verdict. The defendants argue that the trial judge erroneously granted a directed verdict on the defendants' theory that Duffy was demoted.[23] The issue with respect to whether Duffy was demoted arises from the fact that his employment agreement stated that he was a senior managing director, not the head of the CFR group. FTI contends that it contracted with Duffy to fill the position of senior managing

---

[21] In Massachusetts, the standard is whether the "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" (quotation and citation omitted). GTE Prods. Corp. v. Stewart, 421 Mass. 22, 34 (1995).

[22] The amicus notes that requiring the employee to prove intent to force a resignation is problematic because in some situations, such as sexual harassment, the employer may want the worker to remain employed so that the harassment can continue. See, e.g., Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101, 3 F.3d 281, 284-285 (8th Cir. 1993).

[23] At trial, the defendants made this argument with respect to all the individual defendants. On appeal, they pursue the argument only with respect to Duffy.

director, that any title he held beyond that was akin to a rotational leadership position, and that he was not demoted when made "acting" head of the CFR group. The defendants contend that Duffy's employment agreement was modified by the parties' conduct, that FTI contracted with Duffy to fill the position of head of the CFR group, and that Duffy suffered an unjustified, significant reduction in rank when demoted to "acting" head of that group. See Weisman, 69 Md. App. at 743. On this point, there was sufficient evidence to raise a jury question such that FTI's motion for a directed verdict should not have been allowed.

There was evidence that Duffy led the CFR group from 2011 until 2016, first as co-head of the group and then as head of the group, and that FTI began to transition Duffy out of that position not as part of a regular, rotational system but because he would not agree to a drastic reduction in his guaranteed minimum salary. In the light most favorable to the defendants, Duffy's long tenure leading the CFR group and the circumstances in which FTI began to transition him out of the position supported an inference that the position was a contracted-for position, not a rotational leadership position, and that the parties, through their conduct, modified Duffy's employment

agreement to fill the position.  While the inference was not inescapable, it was permissible.[24]

    ii.  <u>Jury instructions</u>.  The defendants also argue that the trial judge erred in instructing the jury, over the defendants' objection, that the defendants had to prove that "FTI set out to force [the individual defendants] to quit their jobs."[25]  As discussed, the <u>Beye</u> court did not adopt that requirement.  In Maryland, the question is "whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign."  <u>Beye</u>, 59 Md. App. at 653.  Accord <u>Williams</u> v. <u>Maryland Dep't of Human Servs</u>., 136 Md. App. 153, 178 (2000).  We conclude that the jury instruction was

---

[24] We are unpersuaded by FTI's additional argument that the evidence, as a matter of law, showed that Duffy's demotion was justified.  There was evidence that Duffy had a minimum guaranteed salary and that FTI made him "acting" head of the CFR group only because he would not agree to a drastic reduction to his salary, which he had no obligation to do.

[25] As noted, FTI's aiding and abetting claim was tried to the judge.  Regardless, the erroneous jury instruction requires vacatur of so much of the judgment as holds BRG liable for aiding and abetting, because the erroneous jury instruction shows that the trial judge also instructed himself incorrectly as to the defense of constructive discharge.  See <u>Rabinowitz</u> v. <u>Schenkman</u>, 103 Mass. App. Ct. 538, 542 (2023), citing <u>Commonwealth</u> v. <u>Beaulieu</u>, 3 Mass. App. Ct. 786, 787 (1975) (we presume that judges correctly instruct themselves as to law absent "contrary indication" in record).

erroneous.[26]  Moreover, the error was prejudicial for the following reasons.

There was evidence of upheaval within FTI and that senior leaders were being terminated or "pushed" out.  The jury could have found that FTI sought to undermine Duffy by removing him from his leadership positions when he did not agree to a drastic reduction to his minimum guaranteed salary.  The jury also could have found that (1) the upheaval had serious ramifications for Coulombe and Fuhr, who relied on the senior leaders who were being terminated or demoted, and (2) at the same time, FTI was strong-arming Coulombe and Fuhr into signing new employment agreements that contained punitive terms.  The jury could have concluded that, in these circumstances, "a reasonable person in the employee's place would have felt compelled to resign." Beye, 59 Md. App. at 653.[27]

---

[26] FTI's reliance on Moniodis v. Cook, 64 Md. App. 1 (1985), is unavailing.  In that case, and others cited by FTI, there was "ample evidence" of an intent to force a resignation, id. at 11, so the court did not need to reach what would have happened had there been no such intent to force a resignation.

[27] Accordingly, we are unpersuaded by FTI's argument that the evidence did not support a conclusion that the individual defendants' working conditions were "so intolerable."  In large part, FTI relies on the fact that there was no egregious personal harassment, but that is not required under Maryland law.  See Weisman, 69 Md. App. at 743 (Maryland does not require "truly outrageous conduct on the part of the employer approximating that needed to constitute an abusive discharge" [quotation and citation omitted]).  FTI also relies on the fact

The erroneous jury instruction, however, invited the jury to conclude that the individual defendants were not constructively discharged so long as FTI did not specifically intend to force their involuntary resignations. The jury may well have based their verdict on the erroneous instruction, as there was evidence from which the jury could have concluded that FTI wanted the individual defendants to remain at FTI, albeit in weakened positions, including working under revised employment agreements that were potentially significantly less lucrative. FTI itself presented testimony that it did not want the individual defendants to leave, as they all generated a significant amount of revenue for FTI. Where the jury may have based their verdict on the erroneous instruction, the error was prejudicial.[28]

that the individual defendants were all well paid employees. That may be true, but it was for the jury to decide whether, given the proposed reductions in their salaries (Duffy's guaranteed minimum salary was cut in half and the other individual defendants' minimum salaries were eliminated), the defendants' working conditions were not "so intolerable."

[28] Given our conclusion, we need not reach an alternative argument raised by the defendants that (1) Maryland law prohibits restrictive covenants that are indefinite in duration and (2) the "Restricted Period" during which the noncompetition and nonsolicitation provisions were in effect, see note 16, supra, was for an indefinite period of time. The defendants rely on the language that stating that the "Restricted Period" could be extended by "the amount of any and all periods that Employee violate[d] the [noncompetition and nonsolicitation provisions." While we need not reach the issue, we provide the

3.  Conclusion.  The judgment on FTI's claim against BRG for violation of G. L. c. 93A is reversed, and judgment shall enter for BRG on that claim.  In all other respects, the judgment is vacated, and the matter is remanded for further proceedings[29] consistent with this opinion.[30]

So ordered.

---

following guidance should the issue arise again on remand.  The defendants rely solely on Nationwide Mut. Ins. Co. v. Hart, 73 Md. App. 406, 413 (1988), which concluded that a restrictive covenant was unreasonable as to duration because it had an indefinite start date.  That is not the circumstance here.  The "Restricted Period" had a definite start date beginning on the date each employment agreement was executed, continued for twelve months after each individual defendant was constructively discharged, and was extended for any period of noncompliance, which was within each individual defendant's control.

[29] As noted, the jury found that Coulombe did not violate the confidentiality provision of his employment agreement.  See note 4, supra.  That issue, having been fairly settled by the jury's answer to a special verdict question, should not be retried.  See, e.g., Burke v. Hodge, 211 Mass. 156, 164 (1912).

[30] FTI's request for appellate attorney's fees is denied.