**GENEX CORPORATION,**

v.

**G.D. SEARLE & COMPANY.**

Civ. No. JFM–85–4154.

United States District Court,
D. Maryland.

July 17, 1987.

Thomas L. Crowe, Cable, McDaniel, Bowie & Bond, Baltimore, Md., Howard Adler, Jr., Davis, Graham & Stubbs, Michael D. Ridberg, Leva, Hawes, Mason & Martin, Washington, D.C., for plaintiff.

Thomas M. Wilson, III, Tydings & Rosenberg, Baltimore, Md., Robert G. Sugarman, Weil, Gotshal & Manges, New York City, Charistopher R. Mellott, G. Stewart Webb, Jr., Venable, Baetjer & Howard, Baltimore, Md., for defendants.

## MEMORANDUM

MOTZ, District Judge.

Genex Corporation has brought this action against G.D. Searle & Co. and Searle Food Resources, Inc. alleging common law fraud and violations of the federal RICO, securities and antitrust laws.[1] Searle has counterclaimed for a double payment which it made to Genex on account. Discovery has now been completed, and Searle has moved for summary judgment as to all of the claims.

### Background of the Controversy

Genex is a company involved in the research, development and manufacturing of biotechnological products. In approximately 1980 it devised a new process for manufacturing L-phenylalanine ("L-phe"), an amino acid. The principal commercial use of L-phe is in the production of aspartame, a low-calorie nutritive sweetener manufac-

---

1. Since the time that this suit was instituted, Searle sold Searle Food Resources, Inc. to Monsanto, and Monsanto and one of its subsidiaries have now been added as defendants. However, the separate legal status of each of the defendants is not relevant to the pending motion and all of the defendants will therefore be referred to collectively as "Searle."

tured and marketed by Searle under the trade name "NutraSweet." Searle holds the United States patent on the use of aspartame as a sweetener. The patent expires in 1992.

In July 1983 the FDA first approved the use of aspartame in carbonated beverages. As a result, a severe shortage of aspartame developed and, because of this shortage, Searle attempted to identify outside suppliers capable of producing L-phe. One of these suppliers was Genex, which in late 1980 had approached Searle with a proposal to supply aspartic acid, the other ingredient of aspartame.

Negotiations between Genex and Searle commenced in early 1983. These negotiations culminated in a license and supply agreement executed on August 14, 1983. The agreement was for a one-year period, called for the delivery of 50 tons of L-phe per month, gave Searle warrants to acquire 9.9% of Genex's stock (at a price substantially above its market value) and granted Searle an exclusive 10–year license to Genex's L-phe technology and improvements thereto.

Statements allegedly made by Searle to Genex during the course of their contract negotiations lie at the heart of this suit. Genex contends (and for purposes of the present motion Searle admits) that Searle represented to Genex that "[1] it would make 'some' L-phe, but preferred to avoid, and did not plan, major back integration into L-phe production; [2] it would conduct a 'horse-race' among external L-phe manufacturers, evaluating short-term performance—measured by reliability of supply, quality and price—to determine which firms would supply its long-term L-phe needs; and [3] a long-term purchase arrangement would follow once Genex proved itself to be a capable and competitive L-phe supplier." In fact, according to Genex, at the time these representations

were being made Searle "was secretly embarked on a major program to make virtually all of its own L-phe by equipping and expanding an existing facility in Harbor Beach, Michigan, and by constructing on a 'fast-track' basis a large volume L-phe facility in Augusta, Georgia, to supply the total L-phe requirements for a new aspartame plant there."

At the time that it entered into the August 1983 agreement, Genex did not have the manufacturing capacity to produce the L-phe which it was obligated to supply to Searle. Accordingly, in September 1983 it entered into a toll manufacturing agreement with Cell Products, Inc. under which Cell Products was to produce L-phe using the Genex process. However, in October 1983 Genex's Board of Directors, drawing upon proceeds of a public offering which had been made in early 1983, approved the acquisition of a manufacturing plant in Paducah, Kentucky, at which various products, including L-phe, were to be manufactured. In the preliminary prospectus for this stock offering, dated August 31, 1982, Genex had stated its intention to use 70–80% of the proceeds of the offering to "construct and equip additional laboratories and to obtain manufacturing facilities."

During 1984 the parties conducted negotiations for a new contract extending beyond the August 1983 agreement. Although in late 1984 Searle issued a purchase order for 650 metric tons of L-phe from Genex to be delivered during the first ten months of 1985, no new omnibus agreement was ever executed. In June 1985 Searle informed Genex that it would not purchase any L-phe after October 1985 when deliveries under the purchase order were completed. This suit followed.

*Fraud Claim* [2]

For the purpose of its summary judgment motion, Searle admits that it made

---

**2.** Genex has sought leave to amend its Complaint to assert a claim for negligent misrepresentation as well. Searle does not oppose the motion, and it will be granted. However, summary judgment will be entered against Genex on the negligent misrepresentation claim on the grounds that (as to the damage allegedly in-

curred in connection with the purchase of the Paducah plant) no reasonable reliance has been demonstrated and (as to the entire damage claim) no facts have been demonstrated showing that Searle owed to Genex any affirmative duty of care. *See, e.g., Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982); *Weis-*

the misrepresentations which it is alleged to have made. The focus of its attack is upon Genex's alleged reliance upon those misrepresentations and the reasonableness of that reliance. *See, e.g., James v. Goldberg,* 256 Md. 520, 261 A.2d 753, 758 (1970); *Call Carl, Inc. v. BP Oil Corp.,* 554 F.2d 623, 629 (4th Cir.1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977).

■ Proper analysis of Searle's argument requires differentiation between two categories of damage claimed by Genex: (1) costs (in the amount of $1,506,054) which it incurred in commercializing and perfecting its L-phe manufacturing process during 1983; and (2) costs (in the amount of $18,279,409) which it incurred in purchasing, designing and equipping the Paducah plant. As to the former, although Genex's assertion that it incurred all of its 1983 L-phe research and development costs in reliance upon Searle's alleged misrepresentations is suspect on its face,[3] genuine issues of material fact are presented which cannot be resolved short of trial. However, as to the Paducah plant claim, Searle's motion will be granted since "the evidence is such that it 'would require a directed verdict'" for Searle. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98 (4th Cir.1987).

■ First, Genex's proof of reliance does not establish its right to recover the full amount of its capital investment in the Paducah plant. The evidence is uncontradicted that Genex had adopted a corporate strategy to develop manufacturing capabilities (and publicly announced its plans to make a stock offering to implement that strategy) before Searle made any of its alleged misrepresentations. Thus, although it may be, as Genex alleges, that it would not have acquired the Paducah plant "but for" the misrepresentations, this is true only in the limited sense that the misrepresentations were the catalyst causing the acquisition decision to be made at the particular time that it was. Further, Jacques Delente, Genex's executive vice president, testified on deposition that in making the Paducah acquisition, Genex was only counting on revenues from sales of L-phe to Searle for the short-term period that it would take Searle to develop the capacity to produce all of its own L-phe. On these facts Genex claims far too much in seeking to recover the full cost of the Paducah plant.[4]

■ Second, if in acquiring the Paducah plant Genex did rely upon Searle's alleged misrepresentations as establishing a long-term relationship in the event that it proved to be the most competitive outside supplier of L-phe, its reliance was unreasonable as a matter of law. Several facts compel this conclusion.

(a) Although Genex could properly assume under the law of fraud that Searle was not lying to it about Searle's present intention not to vertically integrate, it could not properly assume that Searle would not change its intention at any time in the future. Delente's deposition testimony demonstrates that Genex recognized this fact. However, to the extent that it did not do so and relied upon the alleged misrepresentations to project long-term rather than short-term revenues, it was proceeding on a legally untenable premise.

*man v. Connors,* 69 Md.App. 732, 519 A.2d 795 (1987).

3. In that connection, it should be noted that (1) the first alleged misrepresentation was not made until the middle of February, 1983, and (2) Genex stood to benefit from supplying L-phe to Searle even in the short term.

4. Perhaps Genex could have claimed that the loss of short-term revenues from Searle (as distinct from Searle's decision to vertically integrate over the long term) caused it to lose, as a consequence, its entire investment in the plant. However, it has not so asserted. Furthermore, it would appear from evidence which is in the record that it would be impossible for Genex to produce proof to substantiate such a claim since (1) Genex did, in fact, supply Searle with L-phe for approximately two years after the August 1983 agreement was executed, and (2) it appears that Genex never effectively developed the other products which it planned to manufacture at the Paducah plant.

(b) The August 1983 agreement was itself expressly limited to a one-year term. Although, as Genex argues, *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, (4th Circ. 1977), is not definitively dispositive on this point since the one-year contractual term was not necessarily inconsistent with the alleged oral misrepresentations, the limited duration of the written agreement strongly negates the reasonableness of making an $18 million capital investment on the basis of oral representations.

(c) The August 1983 agreement was a result of what Genex concedes to have been long and hard arms-length negotiations in which Genex was represented by experienced and sophisticated legal and business advisors. During the course of these negotiations Genex repeatedly attempted to obtain a long-term commitment from Searle, and Searle steadfastly refused to give it.

(d) Genex admits that it knew that the problem confronting Searle in 1983 was a severe short-term shortage of L-phe. Indeed, Genex attempted (not improperly) to take advantage of that fact during the contract negotiations. Although the existence of the shortage certainly did not entitle Searle to make misrepresentations, it did put Genex on notice that Searle might well modify its plans concerning the purchase and/or manufacture of L-phe after the shortage had abated and its negotiating position had improved.

(e) Genex was in possession of specific information which indicated that whatever oral representations Searle may have been making, it was giving serious consideration to manufacturing its own L-phe. The sources of this information were (i) a conversation in which a representative of Searle told Leslie Glick, Genex's president and chief executive officer, that (as reflected in Glick's notes) "Searle wants to vertically integrate manufacturing including L-phe manufacture;" (ii) another conversation in which a representative of Searle told Robert Johnston, Genex's board chairman, that (as reflected in Johnston's notes) "Searle wants fully integrated on mfg.;" (iii) statements made by a representative of Foster Wheeler, a construction firm which approached Genex about the possibility of building an L-phe manufacturing plant, that it had been contacted by Searle about building a $50 million L-phe plant; and (iv) an article in the Chemical Marketing Reporter on August 22, 1983 announcing the Searle/Genex agreement in which it was stated that a Searle spokesman had announced that Searle "is ... building a $100 million aspartame plant in Augusta, Ga., which will also produce 'a significant amount of phenylalanine' ... scheduled to come on-stream in late 1984 or early 1985" and that "Searle is still dedicated to supplying its own phenylalanine. The material from Genex will supplement our own supply and inventory." Genex explains away all of these pieces of information on the ground that they were not inconsistent with what Searle was telling it.[5] However, if Genex (as it alleges) in the face of this information embarked upon an $18 million investment believing that it would have a long-term supply relationship with Searle but without requiring written assurance of that fact, it took a risk which was entirely disproportionate to its legitimate expectations.[6]

---

5. Genex explains the Glick and Johnston conversations by saying that during them Searle also mentioned that it still desired a "substantial secondary source" of L-phe and would consider a possible joint venture between Searle and Genex after a one-year evaluation of Searle's suppliers. Genex claims that after Foster Wheeler had made its disclosure of Searle's plans, Genex asked Searle whether it intended to build such an L-phe plant, and Searle falsely replied that it did not. Genex's explanation of the Chemical Marketing Reporter article is that it was misleading in stating that Searle intended to produce only "a significant amount of phenylalanine," in referring to the Augusta plant only as an aspartame (as opposed to a partial L-phe) manufacturing facility and in saying that the L-phe to be supplied by Genex would supplement Searle's own production.

6. To show Genex's lack of reliance, Searle points to a memorandum (prepared by Delente) reflecting that on October 31, 1983, Robert Shapiro, the president of Searle Food Resources, specifically asked Leslie Glick if Genex's acquisition of the Paducah plant was contingent on a long-term commitment from Searle to purchase L-phe from Genex. Glick replied "no." Again, Genex explains away this statement by saying that it was content not to have a definitive

RICO Claim

The only ground upon which Searle has moved for summary judgment as to Genex's RICO claim is the alleged lack of evidence as to any fraud committed against Genex itself. In light of the ruling that a portion of Genex's fraud claim survives the summary judgment motion, the motion must be denied as to the RICO claim as well. Of course, it will be incumbent upon Genex to produce at trial sufficient evidence to prove not only its underlying fraud claim but the "pattern" and "continuity" elements of its RICO claim as well. *See, e.g., International Data Bank Ltd. v. Zepkin,* 812 F.2d 149, 154–5 (4th Cir.1987).

*Securities Claim*

Genex claims that Searle violated Section 10(b) of the Securities Act of 1934, 15 U.S.C. Section 78j(b), and Rule 10b–5, 17 C.F.R. Section 240.106–5, by fraudulently inducing Genex to issue warrants for the purchase of Genex stock. Genex's theory is that the warrants were issued as part of the August 1983 agreement, that Genex suffered damages as a result of the fraud leading to the August 1983 agreement and that its damages were therefore "in connection with" a securities transaction.

Genex cites *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) for the proposition that "Section 10(b) must be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection

with' it, there is redress under Section 10(b)...." *Id.* at 12, 92 S.Ct. at 169. *Bankers Life,* however, is clearly distinguishable from the instant case because there the fraud was perpetrated by a corporate insider, and the fraud directly related to the sale: in return for $5 million in United States Treasury bonds the defrauded corporation received a certificate of deposit already pledged to a different corporation. *Yoder v. Orthomolecular Nutrition Institute, Inc.,* 751 F.2d 555 (2d Cir. 1985) and *Technology Exchange Corp. v. Grant County State Bank,* 646 F.Supp. 179 (D.Colo.1986), also relied upon by Genex, are distinguishable as well. In those cases the damages allegedly suffered by the plaintiffs were assets and services provided by them to a seller of securities in exchange for securities whose value the seller had allegedly fraudulently overstated.

Here, Genex's alleged losses were the result of capital investments made by Genex in alleged reliance upon Searle's alleged misrepresentations, not the result of its issuing the warrants.[7] The fact that the warrants were issued as part of the August, 1983 agreement was entirely coincidental to the gravamen of Genex's claim, and "it is not sufficient [simply] to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.1984), (Friendly, J.) *cert.*

---

commitment as long as there would be a "horserace". Because a jury might believe this explanation, Glick's response to Shapiro does not provide in and of itself a basis for granting Searle's summary judgment motion. However, it does reflect that as part of its risk analysis Genex foresaw the possibility that no long-term commitment would be given and nevertheless decided to proceed. Of similar import is a conversation which Glick had with Shapiro in September, 1983 (at the specific direction of Genex's Board before finally approving the Paducah purchase) in which Shapiro refused to commit Searle to any definite long-term relationship with Genex.

**7.** Genex also claims that it failed to receive fair compensation for the warrants, the compensation that Searle had, Genex alleges, orally promised it when Genex sold Searle the warrants:

the possibility of a long-term supply relationship with Searle. This claim fails as a matter of contract law. The August 1983 agreement between Genex and Searle included an integration clause providing that the contract contained the entirety of the agreement between the parties. Genex concedes that it is not challenging the integration clause, and therefore its claim that it received too little compensation for the warrants in the contract itself must fail.

It perhaps also should be noted that the market value of Genex's stock never approached the price at which Searle could exercise its warrants, and there is no evidence that the existence of the warrants had any depressing effect upon the value of the stock. Therefore, assuming that such an effect could give rise to a viable claim for an indirect "securities injury," the record does not substantiate such a claim.

*denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). *See also Head v. Head,* 759 F.2d 1172, 1175 (4th Cir.1985). Indeed, to the extent that there was any relationship between Searle's alleged fraud and the issuance of the warrants, it was that Searle, by making Genex less profitable, debased the value of its own securities. To state this paradox is to demonstrate that the damage claimed by Genex simply is not of the kind which Section 10(b) and Rule 10b–5 are intended to compensate.

*Anti-Trust Claims*

■ Genex's anti-trust claims arise under Section 2 of the Sherman Act. It contends that Searle has monopolized and attempted to monopolize three product markets in the United States: (1) the manufacture and sale of aspartame; (2) the purchase of L-phe used to make aspartame; and (3) the manufacture and sale of L-phe used to make aspartame. In the first two of these markets there is and can be no competition until 1992, when Searle's aspartame patent expires. Therefore, by definition Searle's actions could have no anticompetitive effects through 1992 as required for a Section 2 claim. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 605, 105 S.Ct. 2847, 2859, 86 L.Ed.2d 467 (1985); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Drinkwine v. Federated Publications, Inc.,* 780 F.2d 735, 739 (9th Cir. 1985), *cert. denied,* — U.S. —, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986), *reh'g denied,* — U.S. —, 106 S.Ct. 2002, 90 L.Ed.2d 681 (1986); *Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.,* 735 F.2d 884 (5th Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 910, 83 L.Ed.2d 924 (1985).

■ Of course, Searle would violate Section 2 if it attempted to extend its lawful pre–1992 monopolies in the aspartame production and L-phe consumption markets to the post–1992 period by "willful ... maintenance of ... [its] power." *See United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104. Genex points to various internal Searle memoranda which a jury could find reflect an intent to do precisely that. However, as the Ninth Circuit has succinctly stated, "direct evidence of intent alone, without corroborating evidence of conduct, cannot sustain a claim of attempted monopolization." *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1028 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *see also Conoco, Inc. v. Inman Oil Co.,* 774 F.2d 895, 904–5 N. 6 (8th Cir.1985). Moreover, the conduct which Genex alleges to violate Section 2—Searle's vertical integration of aspartame manufacturing operations—on its face appears to be justified by a "valid business reason." *See Aspen Skiing Co. v. Aspen Highland Skiing Corp.,* 472 U.S. at 604–5, 105 S.Ct. at 2858–59; *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104; *Areeda & Turner,* 3 *Anti-Trust Law,* Sections 726b and 726d (1978). In any event, Genex's claim concerning the post–1992 market contains the same critical flaw as its claim concerning the pre–1992 market: it has produced absolutely no evidence of any adverse impact upon competition caused by Searle's conduct. Indeed, the record establishes that actions taken by Searle in 1983 could not have substantially impacted upon the post–1992 market since Genex admits that only three years' lead time is necessary for a company to commence the manufacture of aspartame.[8]

**8.** Genex points to the fact that the August, 1983 agreement granted to Searle an exclusive ten year license to Genex's existing and newly developing sweetener technology. For several reasons this fact in and of itself is insufficient to sustain any claim as to the post–1992 market. First, the August 1983 agreement contained no restriction as to whom Genex could sell its L-phe, and therefore any potential manufacturer of aspartame could purchase L-phe from Genex. Second, Genex has produced no evidence to show that its technology was so unique that Searle's right to obtain it would have any anticompetitive effect. Third, in early 1986 Searle released Genex from the license. This last fact perhaps would not properly be considered in evaluating whether or not there was a dangerous probability of the success of Searle's alleged

For essentially the same reasons Searle is entitled to summary judgment as to the portion of Genex's claim relating to the pre–1992 manufacture and sale of L-phe. As to that market, although Genex arguably has shown that it has been injured as a competitor, it has produced no proof that competition itself was impaired by Searle's actions. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). A manufacturer in possession of a patent monopoly is permitted vertically to integrate its plant in order to achieve the efficiencies normally associated with such integration. The fact that Searle took this step after having bought L-phe supplies from outside suppliers does not make its decision to integrate a violation of the anti-trust laws. *Cf. Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 375 (7th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987).

■ In the final analysis the fallacy in Genex's anti-trust claims is that it has merely put in Section 2 guise its underlying claim for fraud. Although it is certainly true, as Genex alleges, that fraud can be "an instrument of abuse of monopoly power," it is equally true, as Searle asserts, that "not all fraud perpetrated on a competitor is actionable under the anti-trust laws." The core of an anti-trust claim is adverse effect upon competition, and absent such an effect, an ordinary business tort is not to be converted into an anti-trust violation. *See Merkle Press, Inc. v. Merkle,* 519 F.Supp. 50, 54 (D.Md.1981).

*Searle's Counterclaim*

■ Searle has filed a counterclaim for a double payment which it inadvertently made for defective L-phe supplied by Genex during late 1984 and early 1985. While admitting that Searle did make an over-

payment in the amount of $1,350,000, Genex contends that judgment should not be entered on the counterclaim because it is entitled to assert its fraud claim as a recoupment defense to the amount due on account. In light of the close interrelationship between the respective claims, Genex's position is meritorious. *See, e.g., Billingsley v. Kelly,* 261 Md. 116, 274 A.2d 113 (1971); *Strasbauah v. Stewart Sanitary Can Co.,* 127 Md. 632, 96 A. 863 (1916); *First National Bank v. Shpritz,* 63 Md. App. 623, 493 A.2d 410 (1985).[9] The parties are directed, however, to enter into stipulations as part of the pretrial order which will make unnecessary the presentation of evidence as to those facts concerning the counterclaim which are not in genuine dispute.

## ORDER

As set forth more particularly in the memorandum entered herein, it is this 17th day of July 1987

ORDERED

1. Plaintiff's motion for leave to file an Amended Complaint is granted; and

2. Defendants' motions for summary judgment are granted in part and denied in part.

---

attempted monopolization in 1983. *See, e.g., United States v. American Airlines, Inc.,* 743 F.2d 1114, 1118 (5th Cir.1984), *cert. dismissed,* 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985). However, if Genex were to rely upon any current data in projecting the structure of the post–1992 market, fairness would dictate that the license release also be taken into account.

9. In any event, even if Searle were granted summary judgment on its counterclaim, the entry of final judgment under *Fed.R.Civ.P.* 54(b) would not be proper since this Court would not find that "there is no just reason for delay" in entering it.