540 A.2d 783

**Frederick R. WEISMAN et al.**

v.

**Arthur B. CONNORS.**

**No. 34, Sept. Term, 1987.**

Court of Appeals of Maryland.

May 4, 1988.

Motion for Reconsideration Granted May 27, 1988.

430

Paul F. Strain (Benjamin R. Civiletti, J. Phillip Jordon, Christopher R. Mellott and Venable, Baetjer & Howard, and Oscar S. Gray, on the brief), Baltimore, for appellants.

George Beall and Kristine A. Crosswhite (Miles & Stockbridge, on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

This case primarily concerns the tort of negligent misrepresentation alleged to have arisen from the factual matrix of an arm's length negotiation of an employment contract.

## I

In early April 1981 Arthur Connors and Frederick Weisman, who were previously unknown to each other, met for breakfast at Weisman's townhouse in New York City. Connors at that time was a fifty-six year old vice president of Ford Motor Company, one of about forty vice presidents in Ford's worldwide operations. A veteran of thirty-two years of service with Ford, he directed a staff of sixty and drew an annual salary of approximately $140,000. In addition, he received many substantial non-salary benefits, including annual bonuses averaging about 62% of his salary, participation in a stock option plan involving 12,000 shares of Ford stock, a special savings plan where Ford matched a percentage of deferred compensation, and a pension plan that permitted him to retire at 60% of salary. Connors was provided by Ford with two company cars; Ford also paid Connors' country club membership and the premiums on a $200,000 life insurance policy.

Weisman, a successful entrepreneur, was the sole owner of Frederick Weisman Company (FWC), a holding company whose chief component was Mid-Atlantic Toyota (MAT), a major Toyota distributorship. The two men met to discuss the possibility of Connors' working for FWC as executive vice president. This meeting began a chain of events that led to an employment relationship between Connors and Weisman, to the breakdown of that relationship, and finally to a law suit filed by Connors against Weisman and FWC on November 30, 1983 in the Circuit Court for Anne Arundel County. Connors' complaint contained four counts: (1)

breach of a written contract by FWC; (2) breach of an oral contract by Weisman individually; (3) negligent misrepresentation by Weisman and FWC; and (4) fraud by Weisman and FWC.

Averments in Connors' complaint, upon which evidence was adduced at the ensuing four-week jury trial, disclosed that Connors and Weisman had been brought together largely through the efforts of Korn/Ferry, an executive recruiting firm—a "headhunter" agency—employed by Weisman. Connors testified that he was basically content with his lot at Ford but, enticed by Korn/Ferry's representations of the executive vice president position at FWC, decided "[i]f single happy, double happy's got to be better," and reluctantly agreed to meet with Weisman. A representative of Korn/Ferry, on the other hand, testified that from the very first contact Connors expressed restlessness and discontent with his work at Ford. At that time, Ford was suffering the second of three consecutive years of billion dollar losses, causing among other effects a reduction in Connors' staff from about 100 in 1977 to 60 in 1981. In a letter Connors wrote to Ford in December 1982 he stated that his decision to leave was made prior to seeking any outside employment and was due to a feeling that because of recent staff and policy changes at Ford he "could not contribute to the limit of [his] experience." Connors, however, testified that Ford's financial woes were not a significant factor in his decision to depart because the company's planners were confident Ford would return to profitability by 1983 (which in fact occurred).

In his complaint Connors alleged that at the April 1981 breakfast meeting in New York Weisman made a number of representations concerning the executive vice president position and FWC, leading Connors to believe that FWC was on the verge of a significant lateral expansion of its automotive division into related fields such as automobile rental, insurance, and financing; that as executive vice president he would have an equity participation in this expansion and that the value of these ownership interests

would more than offset the benefits which Connors would sacrifice by leaving Ford; that MAT was a stable franchise; that Weisman's relationship with Robert McCurry, who was then general manager of MAT, was basically amicable though beset with communication problems; and that as executive vice president Connors would have broad executive responsibilities, would report only to Weisman, and would not be required to perform the duties of general manager. Believing these representations, favorably impressed by other aspects of FWC, and finding Weisman to be "an absolutely charming person," Connors began to give serious thought to accepting the FWC position. Doubts, however, remained, chiefly concerning the substantial non-salary financial benefits Connors would lose by leaving Ford.

In mid-April 1981 a second meeting took place, this time in California. Al Toffel, a Weisman consultant, was present along with Weisman and Connors. Connors testified that during the two days of this meeting, the earlier representations were reiterated and expanded upon. According to Connors, he repeatedly voiced his concerns about financial loss from leaving Ford, and each time Weisman responded with assurances such as "we'll handle it," "that's not a problem," "my intent is that you'll be better off if you join me than if you stayed at Ford." Salary was not specifically discussed because, Connors testified, salary was for him a secondary consideration: the prospect of equity participation was the real lure.

Following the California meeting several telephone conversations occurred between Connors, Toffel, and David Smith, a vice president of Korn/Ferry, as Connors neared commitment on taking the FWC position. On May 1, Smith sent Connors a letter setting forth the various matters discussed in regard to Connors' employment and stating that Weisman and Toffel had agreed to them. Included in the letter were some, but not all, of the representations made at the New York and California meetings. Connors showed this letter to his family lawyer, who cautioned that

it was "pretty general" and "loose," especially with respect to equity participation; Connors opined in response that because of the uncertainty attending Weisman's expansion projects it did not seem possible to express the terms more concretely. The terms in this letter, with a few changes and additions, were incorporated into a three-year employment contract drafted by another attorney employed by Connors. This contract was executed by both parties on May 5 and Connors began work on June 1.

Under the contract's provisions, FWC agreed to employ Connors as Executive Vice President for a term of three years, commencing June 1, 1981. The contract specified that "it is expected" that Connors would "have broad responsibility for the entire operations of the Company's Automotive Division, including Mid–Atlantic Toyota," three other subsidiaries, and "related operations," with the general managers of these operations reporting to him. The "basic salary" to be received by Connors was $200,000 per year. Paragraph 3 of the agreement provided for a flat $50,000 bonus at the end of FWC's current fiscal year and, further, at the end of each subsequent fiscal year,

"a bonus to be determined in accordance with a formula to be agreed to between you and the Company prior to the beginning of each such fiscal year. It is anticipated that your bonus target will be $100,000.00 per year. You will also be eligible for consideration of additional merit bonuses, as may be awarded from time to time by the Company in its sole discretion."

Other pertinent provisions in the contract stated:

"4. You will have a vested participation in those future ventures of the Company where you will have operating responsibility. The vested participation for each new venture will be negotiated separately.

5. Two (2) years after the Commencement Date, you and the Company will consider extending the term of your employment for an additional two (2) years upon such terms and conditions as may be mutually agreed upon; if such extension is agreed upon, the term of this

agreement shall be five (5) years from the Commencement Date.

. . . .

7. On or before the Commencement Date, the Company shall purchase, for its own account, 2,300 shares of the common stock of Ford Motor Company. The Company shall forthwith transfer full ownership of such stock to you upon the execution of an extension agreement under paragraph 5 above.

8. On the Commencement Date, and on each anniversary thereof during the term of your employment, the Company shall pay the insurance premium in connection with a $200,000.00 limited payment, full life insurance policy designed to be paid up in ten (10) equal annual installments. Such life insurance policy shall be owned by you and your assigns and the beneficiary thereof shall be your wife or such other person or persons as you may from time to time designate."

During his first days on the job, Connors discovered that Weisman's relations with both Toyota Motors (for which MAT was a regional distributor) and McCurry were troubled, and had been for some time. The two problems were interrelated. McCurry, a former Chrysler vice president, highly regarded in the automobile industry for his ability to sell cars, had become general manager of MAT in late 1979, bringing with him a cadre of former Chrysler executives. At that time (unknown to McCurry) MAT had received official notification from Toyota Motors that its sales performance was unsatisfactory and its franchise might not be renewed. By 1981, under McCurry's leadership, MAT's sales had improved so dramatically that it had become the leading regional distributor in America. MAT profits were high. Personal relations between Weisman and McCurry, however, were stormy. McCurry threatened to quit so frequently that he was deemed to have made a standing offer to resign. Connors put in evidence an unsigned draft letter dated May 29, 1981 (two days before Connors was to begin work), in which Weisman announced McCurry's resig-

nation; an earlier letter dated January 7, 1981, made the same announcement. McCurry's description was that he and Weisman were "totally two different kinds of people." From Weisman's perspective, McCurry was arbitrary, arrogant, uncooperative, and disloyal—"not a team player"— who treated Weisman as though he were a mere stockholder. Moreover, Weisman suspected that McCurry was secretly working to obtain the Toyota franchise for himself.

Yet Weisman was in a dilemma. MAT's franchise agreement with Toyota apparently required Toyota's approval of the replacement of MAT's general manager, and McCurry was well liked and highly respected by Toyota's executives. Also, MAT's cadre of executives, having been selected by McCurry, was loyal to him, and might leave if McCurry were discharged. According to his testimony, Weisman decided to resolve this dilemma by bringing in a senior automobile executive whom McCurry would respect, interposed between himself and McCurry. Hence the search that led to Connors. Weisman testified that at the New York and California meetings Connors was fully apprised of the "McCurry problem" and was told that FWC's lateral expansion was contingent on first resolving this problem. Connors, on the other hand, testified that the McCurry difficulties were sugarcoated as a mere communication problem. Weisman said that he wished to retain McCurry in his organization if at all possible. Connors' theory was that Weisman knew or should have known that McCurry's departure was inevitable and that, as a consequence, Connors would be forced to assume the position of general manager of MAT, a position Connors had made clear he did not want.

McCurry's reaction to Connors' appointment was very negative. Relations between Weisman and McCurry continued to deteriorate, a fact Weisman attributed to Connors' failure to alter McCurry's conduct. In November 1981, over Connors' objection, and in violation of Weisman's claimed precontractual representation that Connors alone would decide McCurry's fate, Weisman required that Con-

nors dismiss McCurry. Since no one else acceptable to Toyota was available, Connors assumed McCurry's duties as MAT's general manager. A few months later, after receiving their yearly bonus, several other MAT executives also departed.

The franchise renewal date was less than a year away, and Weisman and Connors agreed that it was critical to present an image of management stability to Toyota. They also agreed that Connors was to perform MAT's general manager duties only until a suitable replacement could be found. The quality of Connors' performance as general manager was sharply disputed in the testimony at trial; he continued, however, to act as general manager until MAT's franchise was renewed in August 1982, and then beyond that until he left FWC in August 1983. During this time relations between Connors and Weisman became increasingly acrimonious. Weisman faulted Connors for uninspired leadership and inability to find replacements for McCurry and the other departed MAT executives. Connors presented evidence of MAT's commendable performance and faulted Weisman for constant negative outlook and harmful interference in MAT's day-to-day operations. Connors also presented evidence that Weisman failed to include Connors as an equity participant in an automotive venture organized during Connors' time at FWC and that he breached other provisions of the employment contract, *i.e.*, that FWC never purchased the $200,000 life insurance policy for Connors, nor did it acquire the 2,300 promised shares of Ford stock. And while Connors received his $50,000 bonus for 1981 as agreed in the contact, he received only $50,000 of his "target" bonus of $100,000 for 1982, pursuant to the provisions of paragraph 3 of the agreement.

In the summer of 1983, while Connors was on vacation, Weisman hired one Jack Brown as executive vice president of FWC. A new organization chart was circulated that showed Connors, as general manager of MAT, reporting to Brown. Regarding this as a constructive discharge, and

after consulting an attorney, Connors effectively resigned on September 7, 1983.

At the close of Connors' evidence, Weisman moved to dismiss all counts; the trial court dismissed the oral contract count, and the case went forward on the remaining counts.[1] The jury, following detailed instructions from the presiding judge (Goudy, J.), subsequently brought in a verdict for Connors on the written contract and negligent misrepresentation counts, and for Weisman and FWC on the fraud count. Damages on the contract count were set at $221,900, a figure apparently reached by adding the salary and bonus Connors would have received for the remaining nine months of his three-year contract to the cost of the life insurance and automobiles Weisman allegedly failed to provide. On the negligent misrepresentation count damages were set at $2,705,961, the precise sum requested by Connors' counsel in closing argument. This figure represented the present value of all the money and benefits Connors would have received had he remained at Ford from 1981 to 1990 (when Connors would have reached Ford's mandatory retirement at age 65) minus the salary and benefits Connors actually received at FWC. By agreement of counsel the contract award was subtracted from the negligent misrepresentation award, leaving Connors a net award of $2,484,061. Weisman's motions for judgment N.O.V. or, in the alternative, for a new trial were denied.

On appeal, the Court of Special Appeals affirmed the judgment. *Weisman v. Connors,* 69 Md.App. 732, 519 A.2d 795 (1987). It found no merit in Weisman's argument that the elements of the tort of negligent misrepresentation had not been established by the evidence. Specifically, the court rejected Weisman's contention that, absent fraud or the existence of a special relationship between the parties,

---

1. The motion was renewed at the close of all the evidence; among other grounds, it asserted that there was insufficient evidence to establish any negligent misrepresentations. The motion was again denied.

businessmen who bargain at arm's length in a commercial transaction do not owe each other a tort duty of care. In this regard, the court said that while the arm's length nature of the transaction was relevant in determining whether Connors was justified in relying on Weisman's representations, it did not suffice to withdraw the transaction from the scope of the tort. 69 Md.App. at 746, 519 A.2d 795.

The intermediate appellate court next considered Weisman's argument that (1) his alleged inducements to Connors were merely statements of his current intentions and were not the kind of statements to which the tort applies; (2) that it is not possible to negligently misrepresent one's own intentions; and (3) there is no such tort as "promissory negligence," which, at best, was all that was involved in this case. In finding these arguments devoid of merit, the court noted that when the case was submitted to the jury the fraud count was still viable; and that to permit the jury "to consider the fact and context of the various statements allegedly made by Mr. Weisman, including any that may have represented only current intention, was not *per se* wrongful." 69 Md.App. at 746, 519 A.2d 795. As to the negligent misrepresentation count, the court noted that the jury was instructed "that a statement of intention to do or not to do something in the future could not be regarded as a misrepresentation unless the speaker was actually lying— that it was not actionable merely because the speaker 'later changes his mind and acts differently. . . .' " *Id..* [292 Md.] at 746, 519 A.2d 795. The court explained:

"There were a number of things that Mr. Weisman said and promised that never came to pass. Four of them, at least, were critical to inducing Mr. Connors to leave Ford and accept employment with FWC: (1) that Connors would have broad executive responsibilities with regard to FWC in all aspects relating to the automobile business; (2) that he would not be simply the general manager of MAT; (3) that FWC would replace the $200,000 life insurance policy paid for by Ford; and (4) that Connors

would receive equity participation in all new FWC ventures relating to the automobile business, and that the value of those ownership interests would more than offset the pension and other benefits that Connors would forfeit by leaving Ford.

"Whatever may be the nature of other statements made by Weisman, those four went beyond mere current intention or expectation. They were statements of fact— what the job would *be* and what it would *pay*. For the most part, they found their way into the actual contract and meet in every respect the standards set forth in *Martens Chevrolet [v. Seney*, 292 Md. 328, 439 A.2d 534 (1982) ]." *Id.* [292 Md.] at 746–47, 519 A.2d 795.

As to the damages awarded for Weisman's negligent misrepresentations, the Court of Special Appeals noted that the jury had been instructed that it could consider "the value of the salary, bonuses, deferred compensation and benefits and other percs Mr. Connors would have earned if he remained at Ford for such time as you find he would have reasonably remained at Ford ... [less] that amount he actually received since leaving Ford." *Id.* [292 Md.] at 748, 519 A.2d 795. Contrary to Weisman's arguments, the court held that the instruction was in accordance with Maryland law, being based on the "out-of-pocket" theory of damages that seeks to return the plaintiff economically to the position he was in prior to the tortious transaction. The court said:

"To return Mr. Connors to where he was before the transaction requires compensation for all the earnings and other benefits he would have received had he remained at Ford, adjusted to present value and deducting what he actually received from FWC. We see the court's instructions, then, not as expressing a different theory foreign to Maryland law, but as expressing the theory preferred by our law." *Id.* [292 Md.] at 750, 519 A.2d 795.

We granted Weisman's petition for certiorari to consider several questions relating to whether the evidence sup-

ported a negligent misrepresentation cause of action and, if so, whether the jury employed a proper theory of damages in making its award.

## II

Weisman first contends that the imposition of a tort duty of care for statements made in arm's length commercial transactions, where there is no risk of physical injury and no "intimate nexus" exists between the parties, represents a departure from settled Maryland law. Arguing that there can be no actionable negligence without a finding that the defendant owed the plaintiff a duty of care, Weisman says that the tort of negligent misrepresentation was not established by the evidence. He maintains that when, as here, the failure to exercise due care creates only a risk of economic loss, an intimate nexus between the parties, *i.e.*, contractual privity or its equivalent, is required as a condition to the imposition of tort liability. No such special relationship or intimate nexus exists in this case, according to Weisman, because both he and Connors were sophisticated businessmen, total strangers to one another, who simply met in preliminary, arm's length discussions to explore the possibility of negotiating a mutually advantageous employment agreement. There was no relationship at all, Weisman says, between Connors and himself even remotely resembling contractual privity or its equivalent.

Weisman suggests that to impose a duty of care upon him in the circumstances of this case is to create a new tort of promissory negligence for statements of intention or expectation honestly made. As to the four misrepresentations which the Court of Special Appeals said formed the basis for both the fraud and negligent misrepresentation counts, Weisman urges that the court was wrong in holding that they went beyond mere future intentions or expectations and instead constituted statements of fact. On the contrary, Weisman maintains that there can be no negligent misrepresentation unless the statements are of past or present fact. He states that he did no more than describe

his expectations as to what the new position would be and what it would pay; that he was thereby relating his expectations of future facts—what the situation would be later in time, after negotiations refined the relationship and after a contractual agreement had been reached; and that in these preliminary, precontractual discussions with Connors, he (Weisman) did not hold himself out to be a neutral and disinterested purveyor of accurate information but was simply attempting to attract an executive to work for him—a fact so understood by Connors who had an opportunity to investigate the position he was seeking.

Weisman acknowledges that his statements could have sustained a tort cause of action if the jury had found that he acted fraudulently, *i.e.*, that he did not actually have the expectations or the intentions that he expressed to Connors. As to this, Weisman says that if a person represents an expectation about the future without believing that it will come to pass, viz., promissory fraud, he would be liable for misrepresenting a then existing state of mind. Because the jury in this case concluded that he was not guilty of fraud, Weisman argues that the jury necessarily determined that he did not lie about his then existing state of mind. The trial court, according to Weisman, erroneously permitted the jury verdict on the negligent misrepresentation count to stand, as it was not possible for him to negligently misstate the state of his own mind. Weisman explains that if a person harbors the intentions or expectations that he states, he has committed no tort, even if he changes his intentions after the statement or even if events turn out differently than his stated expectancy.

Weisman argues that commercial expectations are protected by contract and not negligence law. This means, he says, that a businessman who wants to protect his expectations that promises of intention of another businessman are accurate must negotiate a contract containing these expectations as a contract term. In this regard, Weisman suggests that the contract between FWC and Connors contained the material terms of their business agreement and

the remedy for the breach of any of them is solely that prescribed by contract law. To add an additional tort remedy for nonfraudulent statements, Weisman says, is both pernicious and duplicative, whether the alleged misstatements are reflected in the contract or not.

(A)

*Elements of Negligent Misrepresentation*

We first recognized negligent misrepresentation as a tort action separate from deceit in *Virginia Dare Stores v. Schuman,* 175 Md. 287, 1 A.2d 897 (1938). In that case the plaintiff, who had been hired to clean the walls of defendant's store, relied on the assurances of defendant's manager that a certain dress display case was sturdy enough to support plaintiff's weight. The manager was wrong. The display case collapsed when plaintiff stood on it, causing him personal injuries. In allowing recovery for the negligent misrepresentation, we stated the elements of this tort:

"[T]he action lies for negligent words, recovery being permitted where one relies on statements of another, negligently volunteering an erroneous opinion, intending that it be acted upon, and knowing that loss or injury are likely to follow if it is acted upon." 175 Md. at 292, 1 A.2d 897.

Although duty was not explicitly required as an element of the tort, we said that regardless of whether plaintiff was an invitee or a licensee, defendant "owed him some duty." *Id.* [175 Md.] at 291, 1 A.2d 897.

*Virginia Dare* involved personal injuries, and when we next considered the tort of negligent misrepresentation in *Holt v. Kolker,* 189 Md. 636, 57 A.2d 287 (1948), we limited this cause of action to cases involving personal injuries. 189 Md. at 639, 57 A.2d 287. *Holt* is also notable for its discussion of duty. Adopting the views of Judge Cardozo in *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275 (1922), we held that "there must be such a relation that one party has the right to rely for information upon the other, and the other giving the information owes a duty to give it with

care." *Id.* [189 Md.] at 640, 57 A.2d 287. In *Holt* a plumber had assured plaintiff that a second floor porch was safe to walk on; he was wrong, for when plaintiff walked on it she fell through to the ground. We held the plumber not liable because he was under no duty to plaintiff to accurately represent the condition of the porch.

In *Brack v. Evans*, 230 Md. 548, 187 A.2d 880 (1963), we discarded the personal injury limitation in negligent misrepresentation actions. The plaintiff there sought recovery of money lost in reliance on misinformation supplied to him by the defendant stockbroker. We held that on these facts the plaintiff had a cause of action. Thus, the present scope and elements of negligent misrepresentation were basically established. Two decades later, in *Martens Chevrolet v. Seney*, 292 Md. 328, 439 A.2d 534 (1982), we reaffirmed the viability of the tort[2] and clarified its elements. Broadening the *Virginia Dare* elements somewhat and incorporating the duty requirement first mentioned in *Holt*, we stated these elements as follows:

"(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

292 Md. at 337, 439 A.2d 534.

---

**2.** In *Delmarva Drilling Co. v. Tuckahoe*, 268 Md. 417, 427, 302 A.2d 37 (1973), we implied that the tort was no longer viable. Although we subsequently recognized the tort in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979), a case involving premarital misrepresentations, significant confusion remained. We dispelled this confusion in *Martens.*

*Martens,* as here, involved an arm's length transaction. There, the buyer of an automobile dealership brought suit against the seller for allegedly misrepresenting the financial condition of the dealership. The seller contended that because of the transaction's arm's length character, it was subject to no duty of reasonable care in its representations and therefore no claim of negligent misrepresentation could succeed. We flatly rejected this "sweeping" assertion. *Id.* [292 Md.] at 338 n. 7, 439 A.2d 534.

In *Flaherty v. Weinberg,* 303 Md. 116, 492 A.2d 618 (1985), we considered whether a cause of action in negligent misrepresentation could be brought against an attorney by a nonclient plaintiff. Finding no employment relationship between the attorney and the plaintiff, we concluded that the attorney owed the plaintiff no duty of care. Thus, the first *Martens* element was not satisfied and no recovery on a negligent misrepresentation theory was possible. In *Council of Co-owners v. Whiting–Turner,* 308 Md. 18, 517 A.2d 336 (1986), we found a duty owed by builders and architects to persons foreseeably subjected to the risk of personal injury because of the builders' or architects' negligence. Allegations of negligent misrepresentation were advanced in that case, but because of their conclusory nature we were unable to state without qualification that an action for negligent representation would lie. We did say, however, that if the evidence disclosed misrepresentations "made under circumstances that satisfy the elements of this cause of action ..., the fact that Appellants have suffered only economic loss will not be a bar." 308 Md. at 41, 517 A.2d 336. The opposite results of *Flaherty* and *Whiting–Turner* illustrate the decisive importance we have accorded the question of duty in negligent misrepresentation claims.

In *Jacques v. First Nat'l Bank,* 307 Md. 527, 515 A.2d 756 (1986), we found that a bank that had agreed to process a loan application owed its customer a duty of care in the processing of that application. While *Jacques* did not involve a negligent misrepresentation claim, we outlined, in general terms, the principal determinants of when a tort

duty of care will be recognized. Two major considerations, we stated, are the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. 307 Md. at 534, 515 A.2d 756. As to that relationship, we stated at [307 Md.] 534–35, 515 A.2d 756:

> "Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability."

As *Jacques* involved economic loss only, we had to determine whether, in the circumstances, there was an "intimate nexus" between the parties and thus a duty of care by the bank to its customer. To shed light on the meaning of "intimate nexus," we there referred to two leading New York decisions involving claims of the existence of tort duties in economic loss cases. In *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922), the court held that a public weigher of beans owed a duty of care in weighing to the buyer of the beans, although the weigher had been engaged only by the seller. By contrast, in *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), the same court held that public accountants who negligently certified a balance sheet for a corporation owed no duty of care to a factor who, relying on the balance sheet, made loans to the corporation. The court in *Ultramares* distinguished *Glanzer* by noting that the service rendered by the public weigher in that case was primarily for the information of the buyer, a fact known to all participants in the transaction. This created a bond between the weigher and the buyer "so close as to approach that of privity, if not completely one with it." 174 N.E. at 446. In *Ultramares,* on the other hand, the plaintiff factor was to the accountant merely one of an "indeterminate class of persons who ...

might deal with the [corporation] in reliance on the audit."
*Id.* To find a duty in these circumstances would "expose
accountants to a liability in an indeterminate amount for an
indeterminate time to an indeterminate class." *Id.* 174 N.E.
at 444.[3]

In *International Products Co. v. Erie R. Co.*, 244 N.Y.
331, 155 N.E. 662 (1927), a case decided by the New York
Court of Appeals in the interim between *Glanzer* and
*Ultramares,* a bailee who negligently informed his bailor
where the latter's goods were stored knowing that the
bailor's inquiry was made for insurance purposes, was held
liable in negligent misrepresentation for the resulting loss.
In discussing the question of duty the court stated:

> "Liability [for negligent misrepresentation] arises only
> where there is a duty, if one speaks at all, to give the
> correct information. And that involves many considera-
> tions. There must be knowledge, or its equivalent, that
> the information is desired for a serious purpose; that he
> to whom it is given intends to rely and act upon it; that,
> if false or erroneous, he will because of it be injured in
> person or property. Finally, the relationship of the par-
> ties, arising out of contract or otherwise, must be such
> that in morals and good conscience the one has the right
> to rely upon the other for information, and the other
> giving the information owes a duty to give it with care.
> An inquiry made of a stranger is one thing; of a person
> with whom the inquirer has entered, or is about to enter,
> into a contract concerning the goods which are, or are to
> be, its subject, is another." *Id.* 155 N.E. at 664 (citation
> omitted).

---

**3.** The attempt to circumscribe the potentially limitless range of eco-
nomic harm in negligent misrepresentation cases has been the raison
d' etre for the requirement of duty. *See* F. Harper, F. James, and O.
Gray, *The Law of Torts,* § 7.6, at 406–12 (2d. ed. 1986). Our decision
in *Holt* was thus in some measure anomalous in requiring a duty
when the risk was not economic harm but rather personal injury. As
we stated in *Jacques,* the determinant of liability in cases involving
risk of personal injury ordinarily is not duty but rather foreseeability.
307 Md. at 534–35, 515 A.2d 756.

That there may be the requisite special relationship or intimate nexus in an arm's length commercial transaction involving pecuniary loss only was clearly established in *Martens Chevrolet v. Seney, supra.* The sale of the automobile distributorship in that case was in every respect as much an arm's length, negotiated transaction between business adversaries as that involved here. During the bargaining period preliminary to the signed contract of sale, the buyers informed the seller of their intention to continue the distributorship's operations and therefore needed accurate information concerning the past profitability of the enterprise. In providing the buyers with a financial "trend sheet" containing inaccurate information which the seller had prepared, and in telling the buyers that they could rely upon it, the seller negligently misrepresented the true facts, thereby subjecting itself to liability for the tort of negligent misrepresentation.

### (1)

### *The Duty of Care in this Case*

The court instructed the jury that the first of five elements of the tort of negligent misrepresentation required to be proved by a preponderance of the evidence was the existence of a duty of care owing from Weisman to Connors. Judge Goudy told the jury that "negligence [was] doing something that a person using ordinary care would not do ... or not doing something that a person using ordinary care would do." He defined "ordinary care" to mean "that caution, attention or skill a reasonable person would use under similar circumstances."

We cannot conclude as a matter of law that the evidence before the jury was legally insufficient to permit it to find the existence of a duty of care upon Weisman at the time he made the representations to Connors concerning the proffered employment. We think the jury could have found from the evidence that the circumstances under which the two men came together in precontractual negotiations created a sufficiently close nexus or relationship as to impose a duty on Weisman not negligently to make statements of

present or past facts about FWC or the new position of executive vice president. The manifest purpose of the meeting between the two high level executives was for Weisman to impart, and Connors to digest, relevant and accurate information concerning FWC and the proposed new position which Weisman intended to create.

That Connors had a great stake in receiving accurate information from Weisman is readily apparent; conversely, Weisman had to realize that negligence on his part in conveying such information could result in considerable economic harm to Connors. Of course, it was Weisman's objective to "sell" Connors, prior to actual contract negotiations, on the wisdom of leaving his career employment at Ford and joining FWC. In this regard, the face-to-face precontractual discussions between Weisman and Connors more closely resemble the intimacy of the *Glanzer* parties than the remoteness of the *Ultramares* relationship. As in *Glanzer*, Weisman could reasonably foresee the probable consequences of negligence in his negotiations with Connors. And there was no question as in *Ultramares*, of "liability in an indeterminate amount for an indeterminate time to an indeterminate class."

As we see it, nothing in *Jacques* mandates the conclusion, as a matter of law, that no special relationship or intimate nexus existed during the precontractual negotiations between Weisman and Connors which led to the execution of the employment contract. Undertaking to induce Connors to accept employment with FWC in the circumstances of this case may be likened to the sellers' representations in *Martens*, prior to entering into a contract of sale, that the distributorship would be profitable, as evidenced by the negligently prepared financial trend sheet. We cannot distinguish *Martens* on the ground suggested by Weisman, namely, that the special relationship found to exist between the parties in that case was because the seller affirmatively assumed the role of accountant in supplying financial information to the buyer. That such information is most often provided by accountants does not mean that the seller in

*Martens* assumed the role of accountant. Indeed, the existence of a special relationship between the parties negotiating the type of high-level, long-term employment contract involved here—particularly where the parties will be working closely in succeeding years—is more plausible than between parties selling and buying an automobile distributorship, who may never see each other again.

To support his view that no duty of care was shown to exist in this case, Weisman relies upon *Texasgulf Inc. v. United Gas Pipe Line Co.*, 471 F.Supp. 594 (D.D.C.1979), and *Western Energy, Inc. v. Georgia–Pacific Corp.*, 55 Or.App. 138, 637 P.2d 223 (1981). We have considered these cases, but do not find them persuasive. Both are based on Louisiana law which has adopted a strict view of the duty requirement that is not consonant with our *Martens* decision. *See Devore v. Hobart Mfg. Co.*, 367 So.2d 836 (La. 1979). Cases from other jurisdictions, like *Martens,* have imposed a duty of care on parties negotiating at arm's length. New Hampshire has a long tradition in this regard. *See, e.g., Weston v. Brown,* 82 N.H. 157, 131 A. 141 (1925) (negligent misrepresentation in sale and purchase of farm held actionable); *Manock v. Amos. D. Bridge's Sons,* 86 N.H. 411, 169 A. 881 (1934) (defendant's misrepresentations that it had insurance in negotiations to hire truck and driver held actionable); *Duffy v. Lindgren,* 117 N.H. 521, 374 A.2d 1175 (1977) (negligent misrepresentation by property owner that he carried insurance covering tree trimmer in the event of injury); *Perkio v. Prunier,* 121 N.H. 871, 436 A.2d 72 (1981) (negligent misrepresentations that parcel was free from encumbrances in negotiation of real estate contract held actionable). *See also Giant Food v. Ice King,* 74 Md.App. 183, 536 A.2d 1182 (1988) (finding that a buyer of ice owed a duty to give correct information to the ice supplier because a "special relationship" existed between the parties by reason of communications extending over seven months); *Ward Development Co. v. Ingrao,* 63 Md. App. 645, 493 A.2d 421 (1985) (negligent misrepresentations by real estate developer and several realtors to property

owners in connection with the development and sale of property); *Haynes v. Cumberland Builders, Inc.,* 546 S.W.2d 228 (Tenn.Ct.App.1976) (holding that a defendant can be held liable in business transactions for negligent misrepresentations).

We thus hold that the requisite privity of contract or its equivalent essential to the establishment of a tort duty of care, as required by *Martens* and *Jacques,* was an issue properly submitted to the jury on the evidence adduced at the trial.

(2)

*Other Elements of the Tort*

We next consider whether legally sufficient evidence was adduced before the jury to establish the remaining elements of the tort, *i.e.,* whether Weisman negligently asserted false statements of past or present facts, intending that Connors act upon them, knowing that Connors would probably rely on the representations; and whether Connors was justified in relying upon the representations and thereby suffered damage proximately caused by Weisman's negligence.

As earlier observed, among the representations made by Weisman, the Court of Special Appeals identified four as "critical," namely, "(1) that Connors would have broad executive responsibilities with regard to FWC in all aspects relating to the automobile business; (2) that he would not be simply the general manager of MAT; (3) that FWC would replace the $200,000 life insurance policy paid for by Ford; and (4) that Connors would receive equity participation in all new FWC ventures relating to the automobile business, and that the value of those ownership interests would more than offset the pension and other benefits that Connors would forfeit by leaving Ford." 69 Md.App. at 746–47, 519 A.2d 795. Two other representations made by Weisman, which were alleged to have induced Connors to leave Ford and accept the position at FWC, also went to the jury, viz: (1) that Weisman told Connors that FWC and MAT had a secure franchise relationship with the Toyota

organization and (2) that Weisman told Connors that he had nothing more serious than "communications problems" with McCurry.

The trial judge instructed the jury that if it found the existence of a duty of care, it had to determine whether Weisman was negligent in asserting to Connors "a false statement of a past or present material fact." As to this element, the court told the jury that a fact "is what is happening, something in existence at that time, and ... an intention can be a material fact." The court next instructed that the jury could, but need not, find that "certain representations" made by Weisman, which Connors claimed were false, "dealt with that which was going to happen in the future." He said that "[o]pinions or judgments are ordinarily not sufficient to support either a negligent misrepresentation or a fraud case [,] [e]ven if [they] turn[ ] out to be wrong." The court then said that if the jury found that "any of the statements" made by Weisman "were really opinions or judgments by the defendant about events in the future" and would have been so understood by a reasonable person, then the jury must find for Weisman. Next, the jury was instructed that a statement "concerning the speaker's intention to do or not do something in the future may be a misrepresentation only if the speaker in fact was lying ... and had no intention at the time he spoke to act as he said he would."

The court further instructed the jury:

"If a person truly states his intention to do or not do something and later changes his mind and acts differently, such statement about his intention is not a misrepresentation ... of a present fact.

"... [I]n the case of any statements made by the defendant about [his] intentions for future actions, you may find these statements were misrepresentations only if you find at the time they were made ... they had no intention of doing that which they said they were going to do. Or had an actual intention to do something they misrepresented saying they were not going to do."

Before instructing on the elements of the fraud count, the court told the jury that it could not find both fraud and negligent misrepresentation. Fraud, it said, was "much the same as negligent misrepresentation," the difference being "in the intent"—that the falsity of the representation of past or present fact was "either known to the speaker or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge." And further, the court instructed, the representation must have been made "for the purpose of defrauding the person claiming to be injured thereby."

The court declined to instruct the jury as Weisman requested that, both as to the fraud and negligent misrepresentation counts, there was no evidence of Weisman's mental state at the time of the precontractual representations, which was legally sufficient to prove the elements of the tort. Specifically, as to the reliance element of the tort, the court instructed the jury that Connors "can't be justified in acting [upon Weisman's representations] if the plain words of the contract are to the contrary." Weisman sought a further instruction that

"under the facts and the evidence in this case each of the allegations of negligent misrepresentation as well as fraud are in conflict with the plain language of the contract, and, therefore, as a matter of law, ... there should have been an instruction ... [that] the matter of the MAT general manager, the matter of the equity ventures, the matter of more than compensated or made whole and the matter of the McCurry discharge or retention ... are in conflict with the plain language of the contract, and the jury should have been so instructed."

The court did not modify its charge to the jury.

### (a) First Four Alleged Misrepresentations

As already indicated, Weisman represented that Connors would have broad executive responsibility with FWC, that he would not be general manager, that he would receive a $200,000 life insurance policy, and would also receive equity

participation in all new FWC ventures. These representations arguably may be characterized in different ways. The Court of Special Appeals characterized them as statements of objective fact—as descriptions of an employment position —"what the job would *be* and what it would *pay*." (Emphasis in original) 69 Md.App. at 747, 519 A.2d 795. Weisman, in stark contrast, characterizes the representations as mere statements of expectation, prediction, or future intention. Connors characterizes the alleged misrepresentations yet another way. In his view they are statements of present intention.

We are unable to agree with the characterization on which the Court of Special Appeals based its decision. Of course, an occupational position may be so well defined and established as to take on an objective existence of its own, apart from the expectations or intentions of the employer. There is no evidence in this case, however, that Connors' future executive vice president's position had this definite and objective quality. Indeed, the evidence shows that the position had been newly created by Weisman, and that the precise nature of its duties was to a great extent dependent on Weisman's wishes. In this regard, the contract, in paragraph 1, stated that it was "expected" that Connors would have "broad responsibility for the entire operations of the Company's Automotive Division." The duties of the position were thus not a matter of objective certainty. Weisman's representations, therefore, were not mistaken misdescriptions of the contours of Connors' future executive vice president's position.

We think, however, that Weisman's characterization of the four representations as mere statements of expectation, prediction, or future intention is also incorrect. Weisman does not take into account the degree of control which he had over the future action or intention he was "expecting." This distinction between predictions or expectations of external events not within the speaker's control and statements about what the speaker will himself do in the future is a clear one, well settled in the relevant case law. *See*

Harper, James, and Gray, *The Law of Torts* § 7.10, at 442–51 (2d ed. 1986). The cases cited by Weisman are not contrary. For example, in *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A.2d 128 (1943), the representations at issue concerned statements made by one Glover that a certain city street would soon be opened. We stated the general rule that a cause of action in fraud could not be predicated on

> "statements as to future events, as to expectations and probabilities, as to what will be or is intended to be done in the future, or mere expressions of opinion about what will occur in the future." Id. [182 Md.] at 374, 35 A.2d 128.

We noted specifically, however, that Glover had no control over when the street would be opened and thus any statement he made could have only been an expression of opinion. *Id.* [182 Md.] at 374–75, 35 A.2d 128. In the present case, Weisman had full control over the nature of the duties that Connors would be assigned and whether he would receive equity participation in Weisman's other business ventures.

We therefore think the four representations are properly characterized as statements of Weisman's present intention. Characterizing them in this manner, however, does not end the inquiry; rather, we must consider Weisman's contention that, as a matter of law, he could not negligently misrepresent his own present intention.

As to all six of the alleged misrepresentations involved in the tort counts, Connors' evidence at trial was principally directed to establishing that they were fraudulently made— that Weisman purposely misstated his actual intentions and expectations, believing one thing and deliberately saying another to induce Connors to leave Ford and join FWC. In rejecting this claim, and finding Weisman liable under the negligent misrepresentation count, the jury necessarily concluded that Weisman's representations were not fraudulent but instead had been negligently made.

■ In the making of representations, "the negligence may occur either in obtaining or in communicating the information" imparted as to past or present fact. Harper, James, and Gray, *supra*, § 7.6, at 406. That the misrepresentation of one's own intention may constitute the misrepresentation of a present fact is clear. *Levin v. Singer*, 227 Md. 47, 63–64, 175 A.2d 423 (1961); Harper, James, and Gray, *supra*, § 7.10, at 445–46. Thus, the negligent failure to properly communicate one's current intentions could be a negligent misrepresentation of a present fact.

■ As to the first four alleged misrepresentations, there was no evidence that Weisman meant, but mistakenly failed, to communicate intentions or expectations other than those that he did communicate. In other words, there was no legally sufficient evidence from which the jury could have drawn a rational inference that Weisman, during his two precontractual meetings with Connors, mistakenly expressed intentions or expectations which were at variance with his true state of mind at the time the representations were made. Demonstrative of the absence of mistake on Weisman's part is the fact that each of these representations found expression, exact or approximate, in the negotiated contract of employment. It was thus error to permit the jury to consider these representations in its deliberations on the negligent misrepresentation count; as to these representations, they should have been withdrawn from the jury's consideration.[4]

---

4. Because each of the first four representations was subsequently grounded in terms of the written employment contract, it may be questioned whether they could ever serve as the basis for an action in negligent misrepresentation. However, in view of our disposition of these representations, we need not address that concern. We nevertheless note that the availability of both tort and contract actions for the same kind of harm has engendered considerable confusion and complexity. *See Prosser and Keeton on the Law of Torts* § 92, at 655 (5th ed. 1984). One thorny question has concerned the effect that the parol evidence rule has on tort actions when the tort and contract actions are based on the same set of facts.

### (b) The Two Remaining Representations

■ As to the other two alleged misrepresentations, the stability of MAT's franchise with the Toyota organization and the state of Weisman's relations with McCurry were statements of present facts; they did not involve Weisman's intentions or expectations and neither representation found expression in the terms of the employment contract. As to the first of these representations, the evidence disclosed that in response to Connors' inquiry concerning the "status of the franchise," Weisman replied that "there were no problems, that they were doing a good job" and that "everything was favorable." As to the second representation, it was Connors and not Weisman who "brought up [the subject of] McCurry." According to Connors, Weisman said McCurry was "doing a fine job for me"; that while McCurry was an "excellent sales manager," this was "the limit of his abilities"; that Weisman had "communications problems" with McCurry "relate[d] to the fact that [McCurry is] an automobile man, I'm not"; and that they had "trouble conversing about ... the automobile business." Connors acknowledged that he had heard that "McCurry had a reputation ... of having a very strong temper ..., a very difficult man to work with and [McCurry] had had problems at Chrysler." Connors said that Weisman told him that

---

In *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982), we reserved judgment on whether the parol evidence rule precluded a tort action based on a negligent misrepresentation that contradicted a term of the contract between the parties to the tort suit. 294 Md. at 119 n. 13, 448 A.2d 332. We there affirmed the related principle that in a suit for rescission of a contract the parol evidence rule precludes the granting of relief for unintentional representations preceding the contract which conflict with the terms of the contract.

Some authorities indicate that oral precontractual representations cannot support an action in negligent misrepresentation if the representation varies or contradicts the terms of a subsequent written contract. *See Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623, 630 (4th Cir.1977); Hill, *Damages for Innocent Misrepresentation*, 73 Colum.L. Rev. 679, 717–18 (1973). No cases, however, address the converse question of the effect to be given in a negligent misrepresentation case to precontractual representations that are consistent with later contract terms.

McCurry's "status ... whether he stays or goes is entirely up to you." In addition, Connors said that Weisman told him: "If you join us with your background that's similar to McCurry that you'll get along fine."

■ We think there was evidence before the jury, which was legally sufficient to permit it to find that these two representations were false, that they were negligently asserted, that Weisman intended that his representations would be acted upon by Connors, that Weisman had reason to believe that Connors would probably rely on these statements, that Connors was justified in relying upon them, and that he thereby sustained damage as a proximate result of Weisman's negligence. In this regard, while the jury rejected Connors' claim that the representations were fraudulently made, this did not preclude it from finding that the representations were so carelessly made as to violate the duty of ordinary care imposed upon Weisman under the circumstances.[5]

In so concluding, we note Weisman's argument that in view of paragraph 6 of the contract, Connors could not justifiably rely on the representation concerning the stability of the MAT franchise. Paragraph 6 made provision for the contingency that the business of MAT might be sold during the term of Connors' employment, in which event he would continue to receive contract benefits for two addition-

---

5. Under Maryland law a negligence case must be submitted to the jury if there be any evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of that evidence being left to the jury; that to meet the test of legal sufficiency, the party having the burden of proving another guilty of negligence cannot sustain this burden by offering a mere scintilla of evidence amounting to no more than a surmise, possibility, or conjecture of negligence but such evidence must be of legal probative force and evidential value. *Curley v. General Valet Service,* 270 Md. 248, 264, 311 A.2d 231 (1973); *Fowler v. Smith,* 240 Md. 240, 246–47, 213 A.2d 549 (1965). The test of legal sufficiency "is whether the evidence serves to prove a fact or permits an inference of fact that could enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the right of the plaintiff to recover." *Stein v. Overlook Joint Venture,* 246 Md. 75, 81, 227 A.2d 226, 230 (1967).

al years. There was testimony from Connors that the doubts he had that lead him to negotiate for paragraph 6 did not concern MAT's relations with Toyota but rather the possibility that Weisman, who was then in his 70's, might die. It was Connors' testimony that he relied on Weisman's assurances and had he known relations were tense and uncertain he would not have risked accepting employment with FWC. If the jury believed Connors, the element of justifiable reliance could have been found.

As to the fifth element of the tort—whether Connors sustained damage as a proximate cause of the two misrepresentations—we think there was evidence from which the jury, acting under the court's instructions, could have so found. Moreover, we are unable to say, as a matter of law, that Connors suffered no damage as a result of these misrepresentations. In determining whether the damage element of the tort was established by the evidence, we do not set off the amount of that damage by the amount received under the contract count; the tort and contract actions are separately considered for purposes of ascertaining whether the damage element of the tort was satisfied. As to the nexus between the two misrepresentations, and any resulting damage to Connors thereby caused, the evidence discloses that MAT's franchise problem was favorably resolved shortly after Connors began his employment with FWC; and that McCurry's departure from MAT in November of 1981 brought that so-called problem to an end. Nevertheless, it was for the jury to determine whether Connors sustained economic loss which was attributable to the two negligent misrepresentations and, if so, how much.[6]

---

6. The trial court instructed the jury that if it found the tort of negligent misrepresentation to be established by the evidence, it could "consider amounts actually lost by Mr. Connors as a result of the negligent misrepresentation," *i.e.,* those amounts which logically flowed from the natural and probable consequences of Weisman's negligent conduct, including "salary, bonuses, deferred compensation ... percs ... earnings if he remained at Ford for such time as you find he would have reasonably remained ... reduced by that which

■ We cannot know, of course, which of the six representations relied upon by Connors were found to be established by the jury in reaching its verdict on the negligent misrepresentation count. As the jury was improperly permitted to consider four of the representations, we think a new trial must be ordered limited to the two present fact representations that we have found were supported by legally sufficient evidence. The jury's award of $221,900 for the breach of the written contract and its verdict on the fraud count are not in any way affected by our decision today.

AS TO THE NEGLIGENT MISREPRESENTATION COUNT OF THE COMPLAINT: JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT FOR RULING ON THE ISSUES RAISED BY THE APPELLEE ON CROSS APPEAL AND, THEREAFTER, THE COURT OF SPECIAL APPEALS IS DIRECTED TO REMAND THE CASE

---

he received from Weisman." Weisman unsuccessfully excepted to this instruction on the ground that it failed to define the proper rule governing damages in negligent misrepresentation cases, "whether out-of-pocket or benefit-of-the-bargain or the flexible rule." It is evident by the amount of the jury's verdict that it assumed that Connors would have remained at Ford until mandatory retirement at age 65; consequently, it appeared to award him the difference between his total compensation package at Ford had he remained until retirement and the amount of his total compensation at FWC, as fixed by the employment contract.

Upon retrial of the case, assuming arguendo a determination of liability against Weisman, the trial court will undoubtedly focus on whether the flexibility rule of damages as set forth in *Hinkle v. Rockville Motor Co.*, 262 Md. 502, 278 A.2d 42 (1971), is an appropriate theory of damages in negligent misrepresentation cases. *See, e.g., Ward Development Co. v. Ingrao*, 63 Md.App. 645, 493 A.2d 421 (1985). The trial court will also want to consider, whatever rule of damages it applies, the period of time for which damages could be recovered, and whether the claimed damages are attributable to Weisman's negligent misrepresentations or to another nonactionable cause unrelated to Weisman's misrepresentations. *See Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir.1977); *Empire Realty Co. v. Fleisher*, 269 Md. 278, 305 A.2d 144 (1973); *Matthews v. Federal Land Bank of St. Louis*, 718 S.W.2d 220 (Mo.App.1986); and *Albrant v. Sterling Furniture Co.*, 85 Or.App. 272, 736 P.2d 201 (1987).

TO THE CIRCUIT COURT FOR ANNE ARUNDEL
COUNTY FOR A NEW TRIAL; COSTS TO ABIDE RE-
SULT.